## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| v. | ) | Case No. 1:21-cv-04859-TWT |
| | ) | |
| EMORY UNIVERSITY, INC., | ) | |
| a Georgia Nonprofit Corporation, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF JANE DOE'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Jane Doe ("Ms. Doe"), by and through her undersigned counsel, and states the following:

## I. NATURE OF THE CASE

1.      This action is brought against Defendant Emory University ("Emory" or "the University") by a former female law student seeking damages and equitable relief pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688, for the University's violations of her right to educational opportunities unobstructed by discrimination based on sex.

2.     First, from September 21, 2018, through, at the earliest, November 30, 2019, Emory continuously and knowingly responded with deliberate indifference to the pervasive, severe, and objectively offensive sexual harassment—including sexual assault, stalking, and two forcible rapes—that a male law student (the Assailant) inflicted on Ms. Doe from August 2018 through November 2019. This sexual harassment and Emory's response thereto denied Ms. Doe equal access to Emory's education programs, activities, and benefits, including, but not limited to, classes, academic advisement, extracurricular activities, and career opportunities.

3.     Second, from March 4, 2019, through, at the earliest, November 30, 2019, Emory engaged in a continuing campaign of retaliation against Ms. Doe for reporting the Assailant's sexual misconduct, for example by encouraging, assisting in, and ratifying her rapist's baseless, retaliatory countercomplaints; punishing and threatening to punish her for engaging in Title IX-protected activities; defaming her as lacking credibility for suffering Post Traumatic Stress Disorder (PTSD); denying her access to education programs and activities; issuing unsupportable No Contact Orders (NCOs) against Ms. Doe at the Assailant's request that prohibited her from speaking to friends and witnesses; constructively expelling her; and attempting to compromise her chances to

pursue a successful career as an attorney by knowingly falsely identifying her as a sexual misconduct perpetrator in her academic records.

4.     Finally, Emory selectively enforced its policies and reached erroneous outcomes in disciplinary proceedings for complaints by and against Ms. Doe due to the University's gender bias against Ms. Doe as a woman.

5.     Additionally, Ms. Doe seeks relief for breach of contract under Georgia contract law. She suffered severe economic harm as a direct result of Emory's frequent and continual material breaches of its contract with her, for example by denying Ms. Doe the opportunity to complete the coursework requirements for a Juris Doctor degree at the University and refusing to follow its own policies in disciplinary proceedings for and against Ms. Doe, including the terms adopted from federal statutes such as Title IX and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. 1094(f), and its implementing regulations ("the Clery Act").[1]

6.     Emory also violated the Covenant of Good Faith and Fair Dealing because it breached its contract with Ms. Doe maliciously due to gender bias against women and by using deceit.

## II. JURISDICTION AND VENUE

---

[1] As established in Counts V (¶¶ 429-445) and VI (¶¶ 448-453) *infra*, Ms. Doe is not seeking relief under the Clery Act, only under Georgia contract law.

7.      This Court has federal-question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) respectively because this action arises under a federal statute, Title IX, and the claims under Georgia contract law are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the unlawful conduct or omissions giving rise to this action occurred within the Atlanta Division of the Northern District of Georgia and because Emory University's principal place of business is within this District.

9.      Venue is also proper under N.D. Ga. L.R. 3.1B(1)(a) and 3.1B(3) in that the Defendant is deemed to reside in the Atlanta Division of the Northern District of Georgia and the activity giving rise to this complaint occurred therein.

### III. THE PARTIES

10.      Ms. Doe is a natural person, and she is a resident and citizen of the United States. Ms. Doe is a member of a protected class as a woman.

11.      At all relevant times, Ms. Doe had a contractual relationship with Emory.

12.      At all relevant times, Ms. Doe was a participant in Emory's education programs and activities, including as a student at the University's School of Law from August 2018 through August 2019, and as a participant in

the University's disciplinary proceedings from August 2019 through, at the earliest, November 2019. Furthermore, the coursework credits she completed at Emory continued to be a part of her education at the law school to which she transferred in Fall Semester 2019 by fulfilling a substantial portion the coursework requirements of the J.D. program she completed on May 8, 2021.

13.     Emory University is a Georgia non-profit corporation with a principal office address of 505 Kilgo Circle NE, 300 Convocation Hall, Atlanta, DeKalb County, Georgia 30322. At all relevant times, Emory was a post-secondary educational institution that receives federal financial assistance as defined by 20 U.S.C. § 1681(c).

## IV. STATEMENT OF FACTS

### A. Emory Discriminates Against Women Based on Gender

14.     Up to and during all relevant times, Emory has exhibited an unmistakable gender bias against women in its education programs and activities, including in the University's treatment of female sexual misconduct survivors who submit complaints against the perpetrators with the University's Department of Title IX (DTIX).

15.     Emory's bias against women survivors is consistent with recent, widespread public pressure for universities to protect male respondents over female complainants in sexual misconduct disciplinary proceedings. While sex

discrimination against women in education programs and activities is not new, some efforts to undermine the legal protections that Title IX and the Clery Act afford sexual misconduct complainants, the vast majority of whom are female, arose in response to a frequently misinterpreted Dear Colleague Letter (DCL) that the U.S. Department of Education's (the Department's) Office for Civil Rights (OCR) issued in 2011. Russlynn Ali, Dear Colleague Letter, U.S. Dep't of Educ. Office for Civil Rights (OCR) (Apr. 4, 2011). The 2011 DCL provided guidance to help schools come into compliance with Title IX by treating parties to sexual misconduct complaints equitably. However, many activists erroneously claimed that the DCL targeted male students and violated their Due Process Rights, sometimes incorrectly conflating female students' campus-based sexual misconduct complaints against other students with the state's criminal charges in the criminal justice system.

16.     In fact, over the last decade, courts across the country have seen a "wave" of Title IX lawsuits against universities by male students who were disciplined for sexual misconduct[2] in which the plaintiffs "allege[d] that the pressure on universities from the OCR has caused a backlash against male

---

[2] *E.g., see* K.C. Johnson, Post Dear Colleague Letter Rulings/Settlements, https://docs.google.com/spreadsheets/d/1CsFhy86oxh26SgTkTq9GV_BBrv5NAA5z9cv178Fjk3o/edit#gid=0).

students accused of sexual assault." Doe v. Brown Univ., 166 F. Supp. 3d 177, 181 (D.R.I. 2016).

17.    Many plaintiffs in these cases were actively recruited, and sometimes provided legal counsel, by new organizations such as Families Advocating for Campus Equality (FACE), which was "founded in 2013 by three mothers of sons who had been falsely accused of sexual misconduct at their respective colleges." Families Advocating for Campus Equality, https://www.facecampusequality.org.

18.    In Georgia, the backlash against female sexual violence survivors rose to the level of aggressive legislation, HB 51, during the spring 2017 legislative session. *See* Tyler Kingkade, Georgia Bill Designed to Limit College Rape Investigations Advances, BuzzFeed News, (Mar. 1, 2017), https://www.buzzfeednews.com/article/tylerkingkade/georgia-bill-campus-rape. The bill's sponsor, Rep. Earl Ehrhart, explicitly stated that his purpose was to protect male students accused of sexual misconduct from disciplinary action. *See* Tyler Kingkade, The Men's Man: Meet the Republican Lawmaker Who Has Taken Up the Cause of Defending College Men Accused of Rape, BuzzFeed News, (Dec. 21, 2017), https://www.buzzfeednews.com/article/tylerkingkade/meet-the-republican-lawmaker-whos-taken-up-the-cause-of. Had HB 51 passed, it

would have required institutes of higher education (IHEs) to favor

respondents over complainants in sexual misconduct disciplinary

proceedings in direct conflict with federal statutes, implementing regulations,

and the U.S. and Georgia Constitutions.

19.     Fearing litigation, many schools have reacted to public pressure

by favoring male respondents in sexual harassment grievance proceedings.

Emory exemplifies this discriminatory paradigm. In fact, the University

individually received public attention when a male student sued for its

response to a sexual misconduct complaint against him. *See* Julia Munslow &

Michelle Lou, Former Student Sues Emory, Citing Bias in the Title IX Process,

The Emory Wheel (Mar. 7, 2018), *available at* https://emorywheel.com/27356-

2/. Shannon McCaffrey & Janel Davis, Secretive Justice: How Georgia

Colleges Handle Rape on Campus, The Atlanta Journal-Constitution, (Apr.

2015), *available at* https://www.ajc.com/news/special-reports/secretive-

justice-how-colleges-handle-rape-campus/SKv4lb4gFupraStLM9j1hM/.

20.     Unquestionably aware of recent pressure from the public,

coupled with the threat of punitive legislation and expensive litigation from

male sexual misconduct respondents, Emory currently weights sexual

misconduct disciplinary proceedings against female complainants even more

heavily than it did before the 2011 DCL, "neglect[ing] and discourag[ing]

survivors of sexual assault." Editorial Board, <u>Clery Report Reveals University's</u> <u>Long Struggle to Overcome Sexual Violence</u>, The Emory Wheel (Jan. 18, 2021), *available at* <u>https://emorywheel.com/clery-report-reveals-universitys-long-</u> <u>struggle-to-overcome-sexual-violence/</u>.

21.     Moreover, Emory has demonstrated a clear pattern of discrimination based on sex against female rape survivors, including not only Ms. Doe, but also Jane Roe and Jane Loe,[3] all of whom were raped and filed sexual misconduct complaints while Emory students. For example, in each woman's case, Emory responded to sexual misconduct complaints by treating the perpetrator far more favorably than the survivor; participating in and furthering baseless, retaliatory countercomplaints from the perpetrator; denying the survivor reasonable accommodations; and making the sexually hostile environment that the survivor faced so intolerable that she was forced to transfer to another school.

### B. OCR Conducted a Program Review of Emory's Responses to Sexual Misconduct Complaints

---

[3] Defendant is aware of Jane Roe and Jane Loe's identities. Ms. Roe and Ms. Loe are just two more examples of Emory's pattern of discrimination against female rape survivors, and, upon information and belief, it is likely that more will come forward as this case progresses.

22.     On December 16, 2013, OCR notified Emory that it "had selected the University for a compliance review [concerning] the University's handling of complaints of sexual harassment, including sexual assault." U.S. Dept. of Educ. Office for Civil Rights, University Compliance Review Letter, at 1, (Dec. 18, 2019), Doc. No. 04-14-6001 (Ex. 1). *See also* Dan Whisenhunt, <u>Sexual Assaults—Feds Investigate Emory's Response</u>, Decaturish, (May 1, 2014), *available at* https://decaturish.com/2014/05/sexual-assaults-feds-investigate-emorys-response/. On December 18, 2019, OCR issued a letter announcing a resolution agreement with Emory to resolve the program review, which had found compliance issues with, *inter alia*, Emory's confusing, overlapping, or inaccurate policy statements, gaps in case records, and inadequate or absent notice to parties of complaints' charges and outcomes. *Id.*

23.     The resolution agreement required Emory to:

    a.  Amend its notices of nondiscrimination to include clearer representations of Emory's legal obligations under Title IX;

    b.  Provide correct contact information for DTIX officials;

    c.  "Post notice of how […] related policies or procedures interact and apply;" and

    d. "maintain a procedure for documenting[4] each report or complaint of discrimination on the basis of sex and the University's responsive actions." *Id.*

24.    In addition, Emory agreed that its Title IX Coordinator would conduct an internal review of its responses to all sexual harassment, including sexual violence, complaints submitted from August 1, 2018, through May 31, 2019, "for compliance with Title IX under the University's revised procedures." *Id.*, at 11. Emory further agreed that the University's Title IX Coordinator would "begin taking appropriate action to address any problems the University identifie[d] regarding how the [complaints subject to review] were handled" by November 30, 2019. U.S. Dept. of Educ. Office for Civil Rights, <u>Emory University Resolution Agreement</u>, (Dec. 18, 2019), Doc. No. 04-14-6001 (Ex. 2).

25.    However, instead of coming into compliance with Title IX, Emory simply tried to hide its operations.

## C. Ms. Doe Entered a Contractual Agreement With Emory Law School

26.    Ms. Doe's parents immigrated to the United States from a Middle Eastern country where practitioners of their religious faith are an extreme

---

[4] "The University advised OCR that it has been creating an electronic database, where it will maintain records of its interactions with individuals who report sexual harassment and sexual violence, as well as records pertaining to resulting investigations and hearings."  *Id.* at 10.

minority. Ms. Doe's family adheres to strict religious and cultural principles that render sexual intercourse—and even more so rape—taboo to the point of being unspeakable. Ms. Doe was also brought up to respect her father.

27.    Ms. Doe earned her Bachelor of Arts degree at one of the top universities in the country in the spring of 2018. She spent that summer in the Middle East, completing a coveted internship with a lawmaker and enrolling part-time at a seminary.

28.    In August of 2018, after returning from her time abroad, Ms. Doe began Emory University Law School's Juris Doctor program. Always an exemplary student, Ms. Doe chose Emory because the University offered her not only a scholarship of $19,000 a year for three years, but also $2,000 a year to participate in a unique program, Religion and the Law, the area of law in which she planned to specialize.

29.    Ms. Doe agreed to provide and did provide the University with money in the form of tuition.

30.    In exchange, the University agreed to provide Ms. Doe with a legal education and to abide by the terms of various publications, including University catalogs, student manuals, student handbooks, websites, policy manuals, and other university policies and procedures.

31.     These documents also represented that the University would abide by federal law, including Title IX and the Clery Act.

32.     Georgia law recognizes implicit contractual obligations arising from such documents. See, e.g., Morehouse Coll., Inc. v. McGaha, 277 Ga. App. 529, 531, 627 S.E.2d 39, 41 (2005) (affirming jury's finding of liability based on failure to follow student handbook).

### D. A Male Fellow Student Subjected Ms. Doe to Sexual Violence

33.     At law school orientation, a classmate, Male Student A, introduced Ms. Doe to the Assailant, a male student enrolled in Emory's Master of Laws (LLM) program. The Assailant was approximately a decade older than Ms. Doe and had already been practicing law in his home country, also in the Middle East, for several years. When the Assailant asked, she gave him her phone number, thinking they could be friends due to their common interests.

34.     On August 18, 2018, the Assailant asked Ms. Doe to join him and a female friend, a diplomat from his home country (the Diplomat), for live music at the Drunken Unicorn Bar. Ms. Doe agreed, believing that the Assailant was not asking her on a date because another woman would be there.

35.     At the bar, the Assailant and the Diplomat bought shots and pressured Ms. Doe to drink with them. However, Ms. Doe only consumed two

13

alcoholic beverages that night, never became more than "buzzed," and was entirely sober by the end of the night.

36.     At some point, the Assailant kissed Ms. Doe consensually several times over a period of five minutes. Afterwards, however, Ms. Doe could not see the Diplomat and decided to go home to avoid being alone with the Assailant. When she told him she was leaving, he asked if he could share her Lyft ride, supposedly to see her safely home before he returned to his apartment.

37.     When they reached Ms. Doe's apartment, the Assailant told her that he needed glass of water while he secured a new Lyft ride. However, when he entered her residence, he began aggressively, nonconsensually kissing and groping her. Frightened and repulsed by the Assailant's nonconsensual sexual contact, Ms. Doe tried to pull away and covered her chest with her hands to keep him from touching her breasts. She also immediately, explicitly, and repeatedly told the Assailant, "We cannot have sex!" and asked him to leave.

38.     However, the Assailant was far stronger than Ms. Doe, and he ignored her clear verbal and physical communications that she did not consent.

39.     When Ms. Doe asked the Assailant to leave again, he stated that he would stay at Ms. Doe's apartment until morning because the alcohol made him sick. He then pulled her clothes off, pushed her down on a bed, and positioned himself on top of her. Ms. Doe brought her legs up to her chest and held them

tightly in the hopes that she could prevent vaginal penetration. However, the Assailant pulled her legs apart and forcibly raped her.

40.     After the rape, Ms. Doe was in shock. Keenly aware that the Assailant was ignoring everything she said, and almost certain that he would retaliate violently if she ordered him to leave again, she crawled as far away from him on the bed as she could, curled herself into the fetal position, and hoped that the Assailant would fall asleep without violating her again.

41.     When morning came, the Assailant rolled over on top of Ms. Doe again and ignored her pleas for him to stop touching her. Again, she brought her legs up to her chest and held them tightly, but he pulled them apart and forcibly raped her a second time.

42.     After the second rape, the Assailant got out of the bed.

43.     Ms. Doe said, "Please get out," walked him to the door, locked it, and began sobbing uncontrollably.

### E. The Assailant Continued to Sexually Harass and Stalk Ms. Doe After Sexually Violating Her

44.     Wary in the knowledge that he had raped Ms. Doe, the Assailant sent her a text at 5:28 p.m. that day, asking, "All good? Safe and sound?" When she had not responded by the 9:22 p.m., he texted her, "🔎," suggesting that he wanted to know why she would not reply.

45.     Ms. Doe could not bring herself respond until the next day, August 20, 2018, and she perfunctorily texted the Assailant that she had received a $150 cleaning bill from Lyft for his vomit.

46.     The Assailant responded,

I'm sorry if I made you feel uncomfortable. […][A]s I recall I was slightly drunk, and you had mixed feelings about it. […] Anyways, I really hope you'll be open to try to see a better and more relaxed me. In fact, I wish we could just forget it never [sic] happened.

47.     Fearful that her rapist would continue to pursue her if she did not respond or retaliate against her if she mentioned the rape directly, Ms. Doe replied that, although she did not believe "'forget it ever happened' [was] the right approach," she wanted to "move on" as "law school colleagues," and the previous night had was "a situation that [she was] not interested in ever happening again."

48.     The Assailant responded that Ms. Doe's response was a "bummer."

**F. Ms. Doe's Cultural Background Affected Her Perspective on Reporting Being Raped**

49.     Because sex is taboo in Ms. Doe's culture, she felt too ashamed to talk about what the Assailant did to her with anyone other than two childhood friends, although she could not bring herself to tell them the full extent of the violence she suffered.

### G. Dean Brokaw Discouraged Ms. Doe from Reporting Being Raped

50.     After the August 20, 2018, text exchange with the Assailant, Ms. Doe tried to avoid him. However, he was enrolled in one of her classes, and she had to see her rapist every time she attended.

51.     As time progressed, continued exposure to her rapist and her increasingly evident PTSD left her unable to sleep or concentrate on her coursework, frequently having to leave class to cry.

52.      By mid-September, Ms. Doe feared that trauma had so dramatically affected her that she would not be able to continue her studies, and, on September 21, 2018, she met with the Assistant Dean of the Law School who was listed as the Law School's Deputy Title IX Coordinator, Katherine Brokaw.

53.     At the meeting, Ms. Doe was both ashamed and terrified of retaliation, so she tried to present what happened as a hypothetical. However, she began to sob uncontrollably.

54.     In response, Brokaw falsely told Ms. Doe that, if Ms. Doe told her verbally that the hypothetical was an account of what Ms. Doe experienced, a group of law professors would be appointed to adjudicate.

55. However, Emory's written policies and procedures required that Brokaw report Ms. Doe's report to the University's Office of Title IX (OTIX) because the Law School itself did not resolve sexual misconduct complaints.

56. Moreover, Emory policy required that any potential hearing panel members disclose possible conflicts of interest.

57. Brokaw knew the University's written policies and procedures.

58. Brokaw intentionally gave false information to Ms. Doe for the purpose of discouraging her from going forward with a formal complaint.

59. Brokaw's response to Ms. Doe's report was clearly unreasonable because it showed that the University wanted to bury its head in the sand about one of its students committing a violent rape, did not consider serious allegations appropriately, provided false information to female student-victims, and actively and intentionally discouraged female student-victims from exercising their rights and protecting their bodily integrity.

60. Brokaw's false statement led Ms. Doe to believe that professors who were in charge of her education and career path would look down on her if she filed a report against the Assailant. Thus, she decided she would need to hide what she was feeling and deal with trauma on her own to finish law school.

## H. The Assailant Admitted to Raping Ms. Doe

61.     On October 9, 2018, the Assailant texted Ms. Doe that he was upset she was ignoring him. The next day, seeing that Ms. Doe would not reply, he confronted her in the class they both took. During the conversation, the Assailant admitted to raping Ms. Doe and said he was sorry.

62.     After the Assailant's "apology," Ms. Doe tried to convince herself that he would not violate anyone else.

**I.     Sexual Misconduct Obstructed Ms. Doe's Access to Emory's Education Programs, Activities, and Benefits**

63.     Ms. Doe's PTSD dramatically limited her ability to participate in classes or activities at Emory. Her rapist was in one of her classes both in Fall Semester 2018 and in Spring Semester 2019, and she became afraid of being alone with any males, including professors or potential study partners. Withdrawn, deeply depressed, and always aware that her rapist could come around the corner at any moment, Ms. Doe had difficulty making herself participate in social gatherings or study groups, and she sometimes was unable to attend classes.

64.     In Spring Semester 2019, Ms. Doe's mental health deteriorated even further.  She physically could not engage in normal day-to-day activities. In the middle of lectures, she sometimes had to run out of the classroom to cry in the bathroom. When she met with professors during office hours, she would erupt in uncontrollable tears mid discussion.

## J. Ms. Doe Reported the Assailant to Appropriate Emory Officials

65.     On February 28, 2019, the Assailant made disturbing comments about women during the First Amendment class Ms. Doe had to attend with him. Frightened, Ms. Doe realized he was a continuing risk to Emory women.

66.     Unable to bear the being proximate to her rapist anymore, Ms. Doe went to Emory's Office of Respect, which operates to provide "support resources for Emory students impacted by interpersonal violence."

67.     On March 4, 2019, Ms. Doe met with the then Title IX Coordinator for Students, Judith Pannell, at OTIX to report the Assailant's sexual misconduct. As Ms. Doe recounted what happened, she cried so uncontrollably that she had to take multiple breaks and even used her emergency inhaler.

68.     After the meeting, Ms. Doe hurriedly submitted a written statement against the Assailant for nonconsensual sexual contact and nonconsensual sexual intercourse, violations of Emory's Sexual Misconduct Policy (SMP).

69.     On March 5, 2019, Pannell notified the Assailant of Ms. Doe's complaint and issued a No Contact Order (NCO) against both of them, even though Ms. Doe had done nothing wrong.

## K. Emory Denied Ms. Doe Reasonable Accommodations and Protective Measures

70.     Despite the fact that Ms. Doe had notified appropriate officials that she had been violently raped, Emory refused to grant most of her requests for reasonable accommodations and protective measures, sometimes providing falsehoods as explanations. In fact, the University openly retaliated against her for requesting accommodations and protective measures.

71.     On March 4, 2019, Ms. Doe asked that she be allowed to attend her First Amendment class without her rapist present due to her disabling PTSD.

72.     However, on March 20, 2019,[5] Pannell sent Ms. Doe an email falsely asserting that American Bar Association (ABA) rules would not allow either Ms. Doe or the Assailant to attend any classes remotely. Pannell also incorrectly claimed that, according to OCR's 2017 Title IX guidance, Emory would be denying the Assailant his education if he were required to attend a class online.

73.     It is clearly unreasonable for a University to respond to a female student-victim exhibiting signs of trauma evident to lay persons by inventing fictious rules to prevent either her or her assailant from attending classes remotely.

74.     On March 20, 2019, after Panell informed Ms. Doe that her accommodations requests had been denied, Pannell sent Ms. Doe an email

_____

[5] At that time, Seidenberg was the "University Title IX investigator" in charge of Ms. Doe's complaint.

notifying her that Kristyne Seidenberg, a "University Title IX investigator," would contact Ms. Doe to set up an interview. Ms. Doe responded that she would like Emory to provide her an advisor from the proceedings. However, it took Pannell five days, until March 25, 2019, to offer Ms. Doe an advisor, Meghan Popick, the Emory employee in charge of "ensur[ing] the best possible customer service and program management" for international students like the Assailant.

## L. Emory's Refusal to Provide Reasonable Accommodations to Ms. Doe Caused Severe Emotional Distress

75.      After receiving Pannell's March 20, 2019, emails, Ms. Doe became disconsolate and found herself walking in a parking lot sobbing, feeling as though she could see her body from far away but could not recognize herself.

76.      Ms. Doe then realized she had to tell her parents what was happening because completing law school now seemed almost impossible.

77.      Ms. Doe told her father ("Mr. Doe") that she had been sexually assaulted. As soon as she began speaking, Ms. Doe could no longer stand and sank to the pavement.

78.      Ms. Doe told her father that Emory would not allow her to attend her First Amendment class without the Assailant present. Mr. Doe responded that he would go to Atlanta to support her and help her get accommodations by talking to administrators.

79.     Ms. Doe told her father about the NCO, and he promised not to call the Assailant. However, unbeknownst to Ms. Doe, Mr. Doe did call the Assailant at 7:42 p.m. that evening in the hopes that the Assailant would civilly agree to transfer out of Ms. Doe's class.

80.     During the call, Mr. Doe asked the Assailant to request to transfer out of the First Amendment class, and Mr. Doe reminded the Assailant that the Assailant committed a criminal act against his daughter. Mr. Doe did not threaten to harm the Assailant, nor did he even raise his voice.

81.     The Assailant, who was in a room with three friends, answered Mr. Doe's call on speakerphone when caller ID showed the call was from the area where Ms. Doe's family lived. At least one of his friends, Male Student B, made a video recording of the call. No one asked Mr. Doe for his consent to record the call, despite the fact that Mr. Doe was in state where all parties must to agree to audio recordings.

82.     The Assailant called his advisor immediately after the call ended, and, at 8:17 p.m., the Assailant filed a police report. At 8:19 p.m., the Assailant's advisor emailed Pannell that the Assailant wished to file a complaint against Ms. Doe and demanded Emory use "appropriate resources" to protect the Assailant.

83.     The Assailant told his friends and Emory personnel that Mr. Doe, whom he had never met, was dangerous due to Mr. Doe's ethnicity.

23

84.     At 9:35 p.m. that evening, also unbeknownst to Ms. Doe, her parents

contacted the DeKalb County Police to report the Assailant for sexual assault,

and officers went to Ms. Doe's apartment to take her statement.

85.     The very next day, on March 20, 2019, the Assailant met with

Pannell to discuss his complaint for Mr. Doe's call, and he brought Pannell an

audio file that he created by editing Male Student B's video recording.

86.     Also on March 21, after Brokaw had repeatedly refused to meet with

Ms. Doe via email, Ms. Doe went to Brokaw's office in an attempt to speak to

Brokaw about Ms. Doe's accommodations requests. However, Ms. Doe was told

yet again that Brokaw was unavailable. When Brokaw's assistant's saw that Ms.

Doe was in tears, her response was to deliver Ms. Doe to Emory Counseling and

Psychiatric Services (CAPS).

87.     On March 22, the Assailant emailed Pannell a written statement of

his complaints against Ms. Doe, alleging violations of the SMP for retaliation,

violation of the NCO, and "harassment."

88.     At some time that day, the Assailant met with Brokaw to inform her

of his complaint, and he told her he was leaving the country for two weeks.

89.     Unaware that the Assailant was also going to meet with Brokaw that

day, Ms. Doe spoke with Brokaw that afternoon. During the meeting she begged

24

Brokaw again to allow her to access her First Amendment class without exposure to her rapist, but Brokaw responded with apathy and denied Ms. Doe's request.

90.     That evening, Brokaw sent the Assailant a follow-up email offering him support services and discussing the terms of the NCO.

91.     On March 23 or 24, 2019, shortly after the police detectives investigating Ms. Doe's rape report began searching for the Assailant, he flew back to his home country.

92.     Upon information and belief, the Assailant has never returned to the United States. However, Emory helped him complete his degree remotely and continued to participate in his relentless retaliation against Ms. Doe.

93.     It is clearly unreasonable for a university to respond to a female student-victim exhibiting signs of trauma evident to lay persons by applying fictious rules to prevent her from attending class separate from her assailant, but allowing her assailant to attend *all* classes remotely.

## M. Mr. Doe Flew to Atlanta to Support His Daughter

94.     Mr. Doe was in Atlanta to support his daughter from March 22 until March 27, 2019. On March 25, 2019, he met with Brokaw to discuss accommodations for Ms. Doe, including concerning Ms. Doe's class with the Assailant. Brokaw immediately emailed Pannell about her meeting with the Mr.

Doe, which Brokaw characterized as "calm and civil," remarking that he was a "slightly built, mild-mannered man."

95.    After meeting with Mr. Doe, Brokaw sent Ms. Doe an intimidating email in which she instructed Ms. Doe to "honor strictly" the NCO by sitting on the opposite side of the classroom from the Assailant in her First Amendment class and "avoiding contact with [him] in the common spaces of the law school." Brokaw also stated that, if Ms. Doe wanted Brokaw to help Ms. Doe meet with a professor outside of class, Brokaw would give the professor "some explanation of why I'm making a request for a meeting that most students make themselves."

96.    On March 26, 2019, even though the Assailant had already left the United States, he emailed Pannell to submit another complaint against Ms. Doe because two of his friends claimed to have seen Mr. Doe on campus. The Assailant also demanded that Emory prohibit Ms. Doe from studying on the second floor of the law library, which was her custom, because the Assailant felt entitled to control the printer there, even while he was out of the country.

## N. **Emory Deliberately Delayed Notifying Ms. Doe of the Assailant's Complaint**

97.    Neither Ms. Doe nor her family knew that the Assailant had filed his complaint until a week later, on March 27, 2019, when Kristyne Seidenberg—who had recently transitioned from being the lead investigator on Ms. Doe's

cases to Interim Title IX Coordinator for Students[6]—sent Ms. Doe an email stating that the Assailant had filed a complaint against Ms. Doe alleging that she violated the SMP by violating the NCO, harassing the Assailant, and retaliating against him, "specifically" because, during Mr. Doe's March 20, 2019, call, the Assailant "was threatened directly" with "bad consequences" if he did not withdraw from the Freedom of Religion class.

98.     The Assailant additionally claimed that "the specific words and context of the call were harassing and intimidating to him [and] that the message given to him in that call may have a retaliatory effect." However, neither the March 27th Notice nor the SMP defined "retaliatory effect."

99.     The Notice also did not identify what the Assailant was alleging made Ms. Doe responsible for a third party's independent actions.

100.     Moreover, like the March 5th Notice, the March 27th Notice ordered Ms. Doe to "refrai[n] from discussion of the investigation," contrary to federal law, regulations, and the Department's guidance.

101.     Seidenberg instructed Ms. Doe that OTIX "protocol" required that Ms. Doe meet with Seidenberg "directly to discuss the complaint filed against

---

[6] In late March 2019, the previous University Title IX Coordinator, Supria Kuppuswami, quit abruptly, and Pannell became the Interim University Title IX Coordinator. When Pannell received her interim promotion, Seidenberg followed, rising from Title IX Investigator to Title IX Coordinator for Students.

[Ms. Doe]." Ms. Doe, who was already reeling from the retraumatization she experienced in an interview she underwent with the DeKalb County Police that day, replied that she needed to speak to counsel before responding substantively to the Assailant's charges.

## O. Emory Conflated Ms. Doe's Sexual Violence Complaint with the Assailant's Retaliatory Countercomplaints

102.    After sending Ms. Doe the March 27th Notice, Seidenberg confirmed Ms. Doe's worst fear when she stated that, although the two parties' complaints would result in "two separate investigations," the Investigators would investigate the matters "separately but concurrently to ensure a timely and thorough process," because the underlying "issues [were] related. However, the pretense of separate investigations failed even as a fiction.

103.    On March 28, 2019, Ms. Doe met with Seidenberg and Pannell for the sole purpose of discussing Ms. Doe's accommodation requests.

104.    However, when Ms. Doe arrived, Seidenberg said that they would not discuss any accommodations until Ms. Doe answered questions about her rapist's accusations against her. In fact, Seidenberg tried to force Ms. Doe to take hold of a physical copy of the March 27th Notice.

105.     When Seidenberg's aggression and hostile questioning caused Ms. Doe to begin sobbing, Seidenberg ordered Ms. Doe to "calm down" and left room, saying she would not return until Ms. Doe stopped crying.

106.     When Seidenberg returned, Ms. Doe repeated her requests for accommodations, including delays for her Introduction to Legal Advocacy, Research, and Communications (ILARC) oral arguments and her final 1L exams, the latter of which she asked to take at a university near her family's home in her home state so that she could quickly leave Atlanta for a supportive environment.

107.     On March 29, 2019, Seidenberg emailed Ms. Doe that her request to postpone oral arguments, which were scheduled to take place on April 2, 2019, had been denied because the delay would "fundamentally undermine the educational purpose of that exercise" and be "disadvantageous" to Ms. Doe's partner, Female Student. Seidenberg also stated that professors "do not re-teach to individual students material that has been presented to the class" and only answer questions about the materials during office hours.

108.     On April 2, 2019, only five days after she received notice of the Assailant's complaints against her, but after weeks of OTIX demanding that she neglect her studies for the sake of OTIX's convenience, Ms. Doe gave her oral arguments under extraordinary emotional distress and with very little preparation: factors that destroyed her usually stellar academic performance.

**P. Emory Conditioned Ms. Doe's Receipt of Accommodations on Forfeiture Her Access to Education Programs and Activities**

109.    When Ms. Doe met with Brokaw on March 22, 2019, Brokaw recommended that Ms. Doe withdraw from her classes and go on leave, which would leave her without any credits for her work that semester—a loss that would cost tens of thousands of dollars and severely compromise her job, or even graduation, prospects.

110.    However, the Assailant's sexual violence and Emory's hostile response had left Ms. Doe feeling physically and emotionally broken, and her healthcare provider advised her that she would not be able to complete her exams without accommodations, including a significant delay, before she took them. However, Emory responded to Ms. Doe's requests so slowly and belligerently that Ms. Doe's attempts to secure reasonable exam accommodations became one of her most stressful and time-consuming activities for the next two months.

111.    In her March 29, 2019, email, Seidenberg stated that Ms. Doe's request for exam accommodations was still being "review[ed]" but that Seidenberg would give Ms. Doe a status update when they met on April 1, 2019, to discuss the Assailant's March 20th Complaint.

112.     On April 1, 2019, seeing that Seidenberg was still conditioning accommodations on Ms. Doe being questioned about her rapist's allegations, Ms. Doe urged OTIX not conflate her requests with the Assailant's charges.

113.     On April 4, 2019, when Emory still had not informed Ms. Doe whether she would receive accommodations for her exams, Ms. Doe sent Seidenberg an email reminding Seidenberg that Ms. Doe's finals were close at hand, and she did not know how she could prepare.

114.     This time, Seidenberg openly attempted to deflect responsibility, claiming, "Our Office does not serve in the role of granting or not granting academic accommodations requests," which directly contradicted the SMP.

115.     On April 9, 2019, Seidenberg claimed that Brokaw had "worked diligently" and reached a proctoring agreement for Ms. Doe to take her exams at law school ("the distant university") in her home state that was so far from Ms. Doe's home that she would have had to stay in a hotel the week of her exams. Incomprehensibly, Seidenberg suggested that Ms. Doe had only requested an a one-week delay for her exams so that she would need to be done by May 9, 2019.

116.     Seidenberg also pointedly instructed Ms. Doe that the Law School "expect[ed]" Ms. Doe to be present in her First Amendment class "for the rest of the semester" because, contrary to its responses to Ms. Doe's requests, Emory granted the Assailant's request to complete the coursework in his home country.

117.    Ms. Doe immediately notified Seidenberg that she was appealing the decision to deny Ms. Doe's reasonable request to take the exams near her home when her healthcare provider believed she was well enough to do so.

118.    However, two days later, on April 11, 2019, Seidenberg responded with "some additional explanation," which consisted of claims that were either misleading or false.

119.    First, Seidenberg claimed the SMP did not provide a process to appeal accommodation requests. However, as Ms. Doe learned later, the SMP did provide a process to appeal "interim measures," and it did not prohibit appeals of accommodation decisions. Moreover, the SMP also did not describe a process for obtaining accommodations, stating only that requests were "considered on a case-by-case basis by the Title IX Coordinator for Students."

120.    Seidenberg also falsely claimed that the requested university told Brokaw directly that it was "unable" to proctor Ms. Doe's exams.

121.    Moreover, Seidenberg suggested two new "reasons" that Ms. Doe could not take her exams more than a week late: 1) Ms. Doe was required to give her professors time to meet the cumulative grading deadline; and 2) the distant university would not be able to proctor her exams after May 9, 2019.

122.    Ms. Doe responded that she had never requested a one-week delay and that, as she had told Seidenberg before, she needed to wait until her

healthcare provided cleared her before she could take her exams. Ms. Doe also reminded Seidenberg that, during their March 28, 2019, meeting, Ms. Doe had asked to receive "incompletes" in her classes until she was able to complete her exams, an option Brokaw had also offered. Ms. Doe earnestly reported, "Your office is immensely hurting my ability to participate in my education as I am not being accommodated in a timely manner."

123.   On April 15, 2019, when Emory still had not responded to her April 11 request, Ms. Doe sent Seidenberg another email in desperation, reminding Seidenberg that exams were scheduled to begin the following week, emphasizing that Emory was "denying [Ms. Doe's] ability to benefit from [her] education."

124.   On April 16, 2019, Seidenberg emailed Ms. Doe a formal letter falsely claiming that Ms. Doe's request to receive "incompletes" in her classes was "an additional accommodations request" and offering an amended selection of "options": 1) take the exams on the original dates at the distant university; 2) take the exams with a one-week at the distant university; or 3) provide medical documentation that she could not take the exams before May 9, 2019, receive "incompletes" in her classes, and then take the exams at Emory in August.

125.   However, Seidenberg also instructed Ms. Doe that she would need to acknowledge that choosing the third option had consequences: a) she would only be considered for a class ranking based on her Fall 2018 grades; and b) she

would be unable to participate in either the On-Campus Interview program or Law Review Write-On Competition—two programs that would have profoundly affected the rest of Ms. Doe's legal education and career.

126.    There was no logical reason to tie On-Campus Interview or Law Review Write-On participation to Ms. Doe's accommodations.

127.    Seidenberg asked Ms. Doe to choose one of her three options by April 19, 2019. However, Ms. Doe was not able to retain an attorney as her advisor until April 22, 2019.[7]

128.    On April 23, 2019, Seidenberg sent Ms. Doe an email reiterating the same unacceptable options for exam accommodations with yet another cruel "consequence," stating that her inability to choose an option by April 19 had "decreased [her] options," including any accommodations for her First Amendment exam. Seidenberg also stated that Ms. Doe would have to take all of her other exams at Emory without accommodations unless Ms. Doe chose one of the three impossible "options" by 5:00 p.m. that day. Moreover, even if Ms. Doe did choose an "option" that day, she could not receive "incompletes" unless she provided her healthcare provider's letter within forty-eight hours.

---

[7] Ms. Doe's advisor acted solely on Ms. Doe's behalf and only conveyed Ms. Doe's thoughts or questions in communications with Emory. Therefore, unless otherwise indicated, "Ms. Doe" will hereafter refer to Ms. Doe both directly and indirectly through her advisor.

129.    Ms. Doe responded that she wanted take incompletes in her classes and would attempt to send the supporting letter by the deadline. However, Ms. Doe also stated that she was still requesting that she be allowed to take her exams at one of many accredited universities in her hometown that would not require hours travel and lodgings. Ms. Doe also offered to speak with her First Amendment professor directly about exam accommodations.

130.    That same day, Seidenberg responded that she was asking the Law School for "clarifications." Seidenberg also repeated the false claim that the university near Ms. Doe's home where Ms. Doe had requested to take her exams ("requested university") denied Brokaw's request, this time adding incorrectly that the requested university would "not be in session over the summer."

131.    Ms. Doe responded that she needed to take her exams where she was living that summer, and that she needed to take them as soon as she was able, not simply waiting until August. She also offered to provide information about the accredited law schools in her hometown that were in session over the summer, which, in fact, included the requested university.

132.    Ms. Doe also asked Seidenberg to explain why receiving incompletes would require her to forfeit her opportunity to participate in OCI and the Write-On competition.

133.    On April 25, 2019, Ms. Doe emailed Brokaw to make sure Brokaw had received Ms. Doe's CAPS counselor's letter supporting her taking incompletes in her classes. To Ms. Doe's dismay, Brokaw responded that Brokaw contacted the counselor directly, and, without Ms. Doe's permission or knowledge, the counselor had issued another letter with new information concerning Ms. Doe's mental health.

134.    That day, Ms. Doe received an email from the requested university stating, "We have responded [to Brokaw's request], affirming our ability to proctor the exams, and are waiting to hear back from them," her First Amendment professor told her that there was "no rush" to complete the exam.

135.    On April 26, 2019, Ms. Doe requested a phone meeting with Seidenberg, which occurred on April 29. During the meeting, Ms. Doe again confirmed that she chose to take incompletes in her classes and that she could not take the exams at Emory, the place where she was raped.

136.    Seidenberg responded that Ms. Doe had no choice but to take the exams at Emory now that she had chosen the incompletes option, although Seidenberg was unable to explain why Emory was now refusing to allow Ms. Doe to take the exams off campus.

137.    On April 29, 2019, unable to bring herself to stay in the place where she had been raped, Ms. Doe flew to her home state to stay with her parents. She did not have time to prepare to move out of her Atlanta apartment.

138.    On May 6, 2019, Ms. Doe, accompanied by her advisor, had a phone meeting with Brokaw and Associate Dean Julie Seaman. Ms. Doe explained that she hoped to take the exams in a few weeks, and she needed to take them where her support network and current therapist were accessible. She told them that she could not take the exams at Emory because she would be alone with overwhelming depression where she had been raped and had to sit near her rapist.

139.    Brokaw and Seaman accusatorily responded that they were "confused" and thought that Ms. Doe was still in Atlanta at that time, as though Ms. Doe had been trying to deceive them. Brokaw and Seamen also suggested that Ms. Doe bring family members with her to Atlanta during her exam week at Emory to avoid going against the Law School's "norm" for 1L exams, and they refused to budge from the April 16 impossible "options."

140.    Ms. Doe followed up with an email reiterating that she was only asking for one modification of their proposal: taking the exams in her hometown. She stated, "I wish I was never raped but I am determined to not let it ruin my legal education or career. I will do anything on my end to make this work."

141.   Two days later, on May 8, 2019, Seaman responded that they were only willing to make one change: Ms. Doe would be able to take her exams before August 5, 2019, but she would still have to take them at Emory.

142.   On May 9, 2019, Ms. Doe asked for Seaman's rationale for not denying Ms. Doe's request to take her exams at the requested university, especially given that she was still facing the same medical concerns that forced her to leave Atlanta quickly and led to Brokaw's initial offer for Ms. Doe to take her exams in her home state. Indeed, Ms. Doe offered to do the work to find a suitable law school in her hometown for Emory's approval.

143.   On May 11, 2019, Seaman responded that Ms. Doe was asking for "an extraordinary and exceptional occurrence" that Emory had never allowed before. Seaman said that the only reason Brokaw offered to let Ms. Doe take the exams off campus was "the confluence of [Ms. Doe's] immediate need to leave Atlanta and [Emory's] semester end-date," but that "those circumstances no longer appl[ied]" because Ms. Doe took "incompletes." In fact, Seaman she was scheduling Ms. Doe's exams at Emory at the end of the month, as though Ms. Doe had mutely agreed to those terms.

144.   There was no logical nexus between taking exams away from Emory without taking incompletes or being forced to take exams at Emory in the event she took incompletes.

145.    On May 13, 2019, Ms. Doe responded,

Rape is an extraordinary and exceptional occurrence. I wish no one ever has to go through the trauma of being a survivor of rape. […] I desperately want to take my exams, but cannot return to the place I was raped to take them.

146.    Ms. Doe also asked Seaman why Emory would not allow her to take exams at the requested university, which had emailed Ms. Doe that it could proctor her exams, and whether the Assailant was allowed to take his exams off campus, since he had left the country.

147.    On May 14, 2019, Ms. Doe spoke with an official from the U.S. Department of Education's (the Department's) Clery Act Compliance Division (CACD) and requested assistance from the Department, and, on May 15, Ms. Doe notified Emory that CACD agreed that her request to take her exams in her hometown was reasonable.

148.    Seaman responded using a different tactic this time: stating that Ms. Doe could only take her exams in her hometown if she did not enroll at Emory Law that fall. In fact, Seaman stated that she would not schedule Ms. Doe's exams at Emory or communicate with the requested university until Ms. Doe decided whether she wanted to return to Emory in the fall.

149.    On May 17, 2019, Ms. Doe responded,

Your suggestion will force me to give up my seat at Emory to be able to take my exams in a time frame that will allow me to pursue my legal

education elsewhere. I will not give up on my legal education. I will not allow the violent crime to take that away from me.

Noting CACD's agreement, Ms. Doe reminded Seaman, "If Emory provides [the Assailant] the accommodation it has repeatedly denied me and made me fight for, that is inequitable."

150.    Finally, on May 20, 2019, Seaman notified Ms. Doe that she could take her exams at the requested university.

151.    It took Emory two months and guidance from CACD to afford Ms. Doe the accommodations it swiftly offered her rapist.

152.    The assailant was permitted to take his exams out of the country without any complications.

## Q. Emory's Investigation Was Biased Against Ms. Doe Due to Her Sex

153.    With Ms. Doe's struggle to obtain reasonable accommodations as an inextricable backdrop, Emory treated her as inferior to her rapist and with open hostility during the ensuing disciplinary proceedings. Moreover, Emory made it clear that the University's officials held her in contempt because she was a female rape survivor with a deeply religious, culturally conservative background who, despite suffering severe PTSD, did not want to give up on her education.

154.     Indeed, fully aware of Ms. Doe's extraordinary circumstances, OTIX began inundating Ms. Doe with requests for interviews even before the investigative team was complete.

155.     On April 6, 2019, overwhelmed by demands from all directions, Ms. Doe notified OTIX that she was working to find an attorney to serve as her advisor, which was particularly important since she was now facing a retaliatory countercomplaint from her rapist. However, her circumstances became even more difficult immediately thereafter.

**R. Emory Threatened to Punish Ms. Doe for Engaging in a Protected Activity**

156.     On April 7, 2019, several of the Assailant's friends talked about the Assailant's flight to his home country, and Female Student, who had not spoken to the Assailant about it, asked about the circumstances of his departure. Female Student then texted Ms. Doe that the Assailant was in his home country, thinking that Ms. Doe would want to know what the Assailant had done due to Ms. Doe's complaint against him.[8] Ms. Doe, who had never asked anyone to ask questions

---

[8] After a religious event that semester, Female Student told Ms. Doe that the Assailant had been abusive to her, and Ms. Doe told her she had filed a complaint against him. Female Student was interviewed by the DeKalb County Police in the criminal investigation of the Assailant.

about the Assailant, responded that she already knew he fled, possibly because the police were looking for him.

157.    One of the friends in the group, Male Student C, looked over Female Student's shoulder, saw Ms. Doe's name on Female Student's phone screen, and informed Male Student B and the Assailant of what he saw.

158.    On April 8, 2019, the Assailant filed an additional sexual misconduct complaint against Ms. Doe, claiming without basis that Ms. Doe had violated the NCO and retaliated against the Assailant by, he wildly hypothesized, instigating the questions Female Student asked Female Student's friends.

159.    Even though, Ms. Doe would have been legally entitled instigate the questions if the allegations were true, OTIX began investigating the Assailant's April 8th Complaint.

160.    However, Emory never issued Ms. Doe written notice of the April 8th Complaint. In fact, Ms. Doe was not even aware of the allegations until the Investigators surprised her with questions about the charges months later.

## S. Emory Blamed Ms. Doe for Its Own Failures to Comply with Federal Law

161.    On April 8, 2019, a new Emory OTIX investigator, Courtnay Oddman, sent Ms. Doe an email stating, "we as investigators must move forward with information that is available to us to ensure for a prompt, thorough, and

impartial investigation of both complaints," regardless of whether Ms. Doe had any input.

162.    Then, on April 12, 2019, Oddman sent Ms. Doe another email blaming Ms. Doe for the investigators' inability to schedule an interview with her, this time including a list of seventeen highly invasive, often accusatory written questions concerning Ms. Doe's complaint against the Assailant.

163.    That same day, Oddman sent Ms. Doe a similar email with questions concerning the Assailant's countercomplaints, even though Ms. Doe had only been notified of one.

164.    Oddman demanded that Ms. Doe submit written answers to both sets of questions within two business days, by April 16, 2019, and stated that the Investigators would complete the investigation without Ms. Doe's input if she missed the deadline.

165.    Realizing that if would be impossible to meet Oddman's deadline, Ms. Doe sent the Investigators an email requesting an extension to submit her responses, stating, "Given the fact that the Title IX office is not giving me accommodations, I need time to be able to fully participate in my education."[9]

---

[9] On April 17, 2019, Female Student told Oddman that she was preparing for her final 1L exams and "[could not] afford to put [her] health and emotional stability at risk," an excuse that Oddman accepted.

166.    On April 16, 2019, just over two weeks after the investigative team was complete and Ms. Doe received the March 27th Notice, Seidenberg emailed Ms. Doe a "case status update" in which Seidenberg baselessly accused Ms. Doe of forcing the Investigators to send Ms. Doe written questions by outright "refus[ing]" to meet with them.

167.    Seidenberg also presented the Assailant as an example Ms. Doe should emulate because he had already had two remote interviews.

168.    Seidenberg threateningly stated, "Please remember that these two investigations are moving forward in the most exhaustive and expedient way possible."

### T. Emory Continued to Help the Assailant Retaliate Against Ms. Doe

169.    On April 22, 2019, the Assailant submitted another baseless "retaliation" complaint against Ms. Doe, this time blaming Ms. Doe for Female Student texting the Assailant him to ask if he was the one who asked the Investigators to call her as a witness, which the Investigators had chosen to do on their own.[10]

---

[10] In fact, Ms. Doe was not able to submit a witness list until the following month.

170.    Ms. Doe participated in the investigation without any knowledge of the April 22nd Complaint, until OTIX issued its investigation reports for the cases ("the Reports") four months later.

**U. Emory Obstructed Ms. Doe's Attempts to Be Accompanied by Her Advisor of Choice**

171.    Ms. Doe was not able to retain an attorney to serve as her advisor until April 22, 2019, and, on April 23, 2019, she requested additional time to submit her written answers to Oddman's questions so that that the advisor would have time to familiarize herself with the case enough to assist Ms. Doe.

172.    On April 26, 2019, Seidenberg responded by blaming Ms. Doe again for not having scheduled enough interviews with the Investigators, stating that Ms. Doe could have "additional time" to submit her responses to the questions but that the Investigators planned to submit their reports by "approximately May 1st, and they need [Ms. Doe's] response prior to that date so that [her] information [could] be included in the Investigative Reports."

173.    Ultimately, now that she had an attorney, Ms. Doe chose to schedule an interview with the Investigators for May 2, 2019, instead of submitting written answers to Oddman's questions.

174.     On the day of the interview, Ms. Doe notified OTIX that she could only answer questions about her complaint against the Assailant that day but would be able to discuss the Assailant's complaint the following week.

175.     However, Seidenberg responded, "It is my understanding that, because of the need to move forward and also because of the previous unavailability of [Ms. Doe] to the investigators, today's interview will encompass questions about both matters."

176.     That afternoon, Ms. Doe underwent a live telephone interview with the Investigators during which she experienced excruciating flashbacks, terror, and depression.

177.     Despite the effects of her deep shame and PTSD, Ms. Doe answered the questions truthfully and to the best of her ability, and her testimony was consistent with her previous statements.

178.     After the interview, Ms. Doe emailed Seidenberg with requests for clarification, including whether the Assailant was charging her with sexual harassment. Seidenberg's only response was to state the Assailant used the word "harassment."

179.     On May 9, 2019, Ms. Doe met with Seidenberg by phone in an attempt to obtain substantive answers to her procedural questions.

180.    During the meeting, Ms. Doe explained to Seidenberg how detrimentally the disciplinary proceedings impacted her academic career and mental health, especially given that her final 1L exams were scheduled to take place within days, and, at the time, Emory was still refusing to give her the necessary accommodations. Indeed, even seeing emails in her inbox from OTIX gave her flashbacks of the rapes.

181.    Ms. Doe asked Seidenberg if she could withdraw her complaint and then reinitiate it after exams. Seidenberg answered that Ms. Doe could withdraw her complain and then reopen it in the future, even if she were no longer an Emory community member. The only change would be the level of sanctions they could impose if the Assailant was no longer an Emory student.

182.    On June 11, 2019, immediately after Ms. Doe completed her exams at the requested university, Ms. Doe underwent a second interview with the Investigators in which she was subjected to another battery of insensitive, often accusatory questions.

183.    On June 25, 2019, still recovering from the trauma of her June 11 interview, Ms. Doe emailed Oddman asking that her future interviews be conducted in writing due to the overwhelming emotional distress the Investigator's deportment during live questioning had caused.

184.    On June 28, 2019, after learning that her advisor would not be available due to a family medical emergency, Ms. Doe requested an extension for the July 4, 2019, deadline the investigators had given her to submit written answers to the questions concerning the Assailant's complaints. However, OTIX only extended the deadline to July 8.

185.    On June 28, Ms. Doe also asked Oddman to explain why Oddman included questions about the alleged conversation with Female Student on April 7, 2019, which had nothing to do with Mr. Doe's call.

186.    On July 1, 2019, while Ms. Doe's advisor was not available, Oddman emailed Ms. Doe an amended version of the April 12 questions about the Assailant's complaints. In the amended questions, Oddman stated for the first time, "The complainant is alleging that the second violation of the no-contact order happened on April 7, 2019." However, Oddman did not provide Ms. Doe a notice of the Assailant's April 8th Complaint, nor did she explain what parts of the SMP Ms. Doe allegedly violated.

187.    Oddman's email also stated that the Investigators had no further questions about Ms. Doe's complaint against the Assailant, which surprised and alarmed Ms. Doe given that the Investigators had to stop questioning her in the middle of the June 11 interview due to time constraints.

188.    On July 4, 2019, Ms. Doe forwarded Oddman an email her advisor

received from Mr. Doe stating, "My daughter did not ask, suggest, initiate or in any way request that I contact the respondent. My daughter discouraged me from contacting him." Mr. Doe also attested that his call had nothing to do with the Title IX process and that he only came to Atlanta to support his daughter.

189.    On July 8, 2019, Ms. Doe submitted written responses to the investigator's questions about the Assailant's March 20th Complaint. However, Ms. Doe stated that she could not respond to questions about his April 8, 2019, complaint until she received notice of the new claims against her.

190.    That day, Pannell informed Ms. Doe that Emory had amended the SMP since Ms. Doe submitted her complaint and that the new 2019 version would be controlling in the cases. Pannell, however, did not identify all of the changes that had been made or how the changes would impact Ms. Doe's complaint.

191.    Then, on July 10, 2019, Ms. Doe submitted an additional personal statement concerning her complaints against the Assailant. Despite Oddman's claim that they did not need any more information from Ms. Doe, Ms. Doe wanted to be sure Emory would understand what the Assailant did to her.

**V. Emory's Investigation Reports Were Severely Biased Against Ms. Doe Because She Was a Female Rape Survivor Attempting to Access Her Education**

49

192.    On August 14, 2019, after five weeks of silence from the Investigators, Seidenberg emailed Ms. Doe two "investigation reports" ("the Reports"): one for Ms. Doe's complaint and one for the Assailant's complaints. Both of the Reports were severely and unabashedly biased against Ms. Doe.

193.    In fact, both of the Reports' "credibility assessment" sections cruelly attacked Ms. Doe for being a woman exhibiting classic symptoms of PTSD and coming from a conservative religious and cultural background, not to mention the fact that she was a 1L struggling to keep up with her coursework and secure necessary accommodations.

194.    The vast majority of rape survivors find it excruciating, if not impossible, to describe being violated in detail, especially to strangers who are interrogating them. Moreover, survivors often have difficulty remembering parts of the events or contextual details that surround sexual violence because the brain creates memories differently during traumatic events.

195.    However, the Reports attacked Ms. Doe for being honest when she stated that she could not confirm or deny some of the details from the Assailant's versions of events. For example, the Reports claimed that Ms. Doe completely changed her story because she told them she did not know anyone with Male Student C's name and, after consideration, said that it was not impossible that she met Male Student C at the crowded bar but that, if she did, it was "not

particularly memorable," especially since she was raped shortly thereafter and may have been slightly buzzed earlier in the night. In fact, the Report even falsely claimed that Ms. Doe subsequently admitted that she "likely" met Male Student C at the bar but did not recall largely because she had drunk too much.

196.   Furthermore, as Ms. Doe informed OTIX and the investigators, she was a deeply religious individual who came from a culture in which no one talked about rape, and her shame was so overwhelming that she could not tell her parents that she had been violated until she became physically ill; even then, she could not use the word "rape" and never described what happened in detail.

197.   Nevertheless, the Reports viciously claimed that Ms. Doe was of "questionable" credibility because she was "hesitant to give detailed answers" to questions demanding graphic details about taboo acts that resulted in the most traumatic experiences of her life.

198.   The Reports did mention, however, that Ms. Doe submitted her July 10, 2019, statement after Oddman claimed that she did not need any more information from Ms. Doe.

199.   The Reports also attacked Ms. Doe for exercising legally protected rights. For example, the Reports derogated her for "lack of response" because she stated that she could not answer questions about the Assailant's complaints for which she had not received notice, even though Ms. Doe also offered to answer

questions about the additional complaints once she received written notice of them.

200.    In addition, the Reports criticized Ms. Doe for answering some of the Investigators' questions in writing, even though Oddman was the one who first sent Ms. Doe written questions, and Oddman gave no indication that written answers would cast doubt on Ms. Doe's credibility.

201.    The Reports also appeared to pick random occurrences to fault Ms. Doe, for example because Lyft took too long to send her pictures of the Assailant's vomit, because Mr. Doe sent his email statement to investigators through Ms. Doe's advisor, and even because Mr. Doe's chose July 4th to send his statement.

202.    The Report also accused Ms. Doe of being untruthful because she agreed to allow the Assailant to escort her home in the Lyft ride, which would require the Lyft driver to drop Ms. Doe off at her apartment first even though Ms. Doe's residence was further from the bar than the Assailant's.

203.    On the other hand, the Reports ignored the instances in which the Assailant actually perpetrated the malfeasances they misattributed to Ms. Doe.

204.    Indeed, the Assailant's testimony was full of clear inconsistencies and often directly contradicted hard evidence.

205.    For example, the Assailant claimed in an interview that he had once dated Female Student. Later, however, he claimed that he had never dated Female Student but that she had "convinced" him to have sex with her.

206.    Additionally, the Assailant testified that he was not intoxicated on the night of August 18, 2019, and that he did not vomit on the Lyft car. However, he admitted to vomiting and being drunk in texts not only with Ms. Doe, but also with the Diplomat, whom he actually told he would "never drink again" next morning.

207.    The Diplomat also testified that the Assailant told her that he did not decide to file a complaint against Ms. Doe until after Brokaw "sent him an email asking him not to enter the library," even though he filed the complaint two days before Brokaw sent the email.

208.    Most strikingly, the Assailant's testimony about his sexual conduct drastically contradicted his texts to Ms. Doe. The Assailant's narrative consisted of lengthy, implausible, graphic descriptions of exuberant sexual intercourse that bore the stamp of bad romance novels. However, in his August 20, 2018, texts to Ms. Doe, the Assailant explicitly admitted that Ms. Doe was not comfortable with what he did and that he wanted her to forget it ever happened—something his texts with the Diplomat also suggested.

209.    The Assailant also claimed that he was hesitant to file complaints concerning Mr. Doe's call because he was too frightened. However, he filed a police report and a Title IX complaint less than half an hour after Mr. Doe's call—time he spent calling his advisor and parents. Moreover, the Assailant's March 20th Complaint was the first of many he submitted against Ms. Doe.

210.    Additionally, although the Reports criticized Ms. Doe for accepting Oddman's offer to answer questions in writing after undergoing two live interviews, the Reports did not mention that the Assailant always received the questions prior to his interviews, and he simply read his answers to the investigators out loud from prepared written statements. Indeed, unlike Ms. Doe's witnesses, most of the Assailant's witnesses also submitted written statements instead of answering questions in real time.

211.    Inexplicably, although the Reports criticized Ms. Doe for Lyft's slow response to her requests for pictures of the Assailant's vomit, they made no mention of his failure to produce what he alleged were screenshots of Ms. Doe's Facebook page showing that she befriended a woman at the bar.

212.    Although the Reports were devastatingly cruel to Ms. Doe, she did learn some important new information about what happened behind the scenes.

213.    For example, Brokaw testified that she had "extended quite a bit of accommodation and stretched some of our policies" for the Assailant:

For instance, normally we would not allow a student to do what [the Assailant] did, which is go home halfway through the semester and complete his work remotely. And that was what he asked. He wanted to go home. I think he left during spring break and didn't come back. And we worked very hard to make that happen and keep him on track to graduate on time.

214.    The Reports also revealed how much of a role the Assailant's racism played in his complaints against Ms. Doe and her father. In addition to comments from several of the Assailant's witnesses that the Assailant told them he knew Mr. Doe was dangerous due to Mr. Doe's ethnicity, Emory Police Detective Randall Terry noted that "there must have been some cultural implications there as far as elders and parents" underlying complaints from the Assailant, who explicitly admitted that "no official threats were made."

215.    Ms. Doe also learned for the first time that, on March 22, 2019, Terry and Pannell presented information from the Assailant to Emory's Threat Assessment Team (TAT), which "consists of representatives from the various university agencies, [and] receives, assesses, and responds to information on perceived threats to the safety and security of university students, staff members, visitors, and property." The TAT report identified only as Mr. Doe as "Father of Emory University Student [Jane Doe]."

216.    However, Emory never conducted a TAT review of the Assailant, even though it received notice that he repeatedly and forcibly raped Ms. Doe.

217.    Another problem with the Reports was that they excluded crucial information that Ms. Doe submitted to present her case.

218.    For example, the Investigators unjustifiably failed to interview Female Student at all, even though Female Student was the only person other than Ms. Doe who had direct personal knowledge that the April 8th Complaint was false.

219.    On April 17, 2019, Female Student responded to Oddman's request to schedule an interview by stating that she had to prepare for exams and an interview concerning the Assailant would be detrimental to her emotional health. However, Oddman never attempted to follow up with Female Student after exams, nor did she offer Female Student the option of responding to written questions.

220.    In fact, Oddman diverged from Emory policy by instructing Female Student that she was "not obligated to participate" in the investigation; the SMP, on the other hand, stated that Emory could order any student "to give testimony relevant to the case under consideration."

221.    Oddman also only made very little attempt to contact one of Ms. Doe's witnesses, and the Investigators failed to include or even mention the screen shots Ms. Doe submitted of the September 15, 2018, message exchange in which Ms. Doe told the witness that the Assailant sexually assaulted her.

222.    Even more alarmingly, the Report for Ms. Doe's complaint omitted Ms. Doe's July 10, 2019, statement from the appendices, while the Report for the Assailant's complaints excluded all of Ms. Doe's witnesses' testimony.

223.    Ultimately, both Reports asserted devastating "conclusions" that clearly reflected the Investigators' bias against Ms. Doe: while the Investigators found that, given Ms. Doe's "questionable credibility," "there was not sufficient evidence and or testimony to substantiate a conclusion on the likelihood of non-consensual sexual intercourse," they concluded that the Assailant's baseless, retaliatory claims "may be substantiated," since, according to the Reports, the Assailant "[had] high credibility."

## W. Emory Constructively Forced Ms. Doe to Temporarily Withdraw Her Complaint

224.    When Seidenberg issued the Reports, she instructed Ms. Doe that she had only five business days, until August 21, 2019, to submit a response to two almost incomprehensible reports with pages numbering in the hundreds, the outcome of which would affect her for the rest of her life. Thus, on August 15, 2019, Ms. Doe requested that the parties be given an additional two weeks to complete their responses.

225.    However, Seidenberg only granted two additional days—until August 23, 2019—inexplicably claiming that Ms. Doe was responsible for

Seidenberg's inclemency because Ms. Doe had asked for accommodations for her PTSD previously during the investigation and been "reticent to provide evidence."[11]

226.    As Ms. Doe struggled to prepare her responses to the Reports, Emory dealt her another series of shocking blows.

227.    On August 19, 2019, as Seidenberg sent Ms. Doe a notice that Seidenberg had issued an NCO against Ms. Doe, who had decided not to enroll at Emory in the fall and lived in a different state, because, according to Seidenberg, Male Student A submitted a "Title IX complaint" against Ms. Doe for violating the SMP because she had allegedly "contacted him as a witness" on August 15, 2019, and "the effect of this contact was retaliatory, harassing, and intimidating, and […] these contacts discouraged him from further participating in the Title IX process."

228.    On August 21, 2019, Ms. Doe, still in shock from Male Student A's alleged "complaint" against her, received another notice with nearly identical language alleging that Female Student had also filed a "Title IX complaint" against Ms. Doe for trying "to contact her as a witness," also on August 15, 2019.

---

[11] During the hearing, The Assailant, whom the Reports praised as "prompt" and "timely," testified that he had also unsuccessfully asked that the parties be given more time to submit responses.

229.     Although Emory never showed Ms. Doe any "complaints" filed by Male Student A or Female Student, Ms. Doe suddenly found herself unable to speak to key witnesses who had once been her friends. Ms. Doe was particularly devastated that she could no longer speak to Female Student because Female Student understood how violent the Assailant could be, Ms. Doe had warned her to stay away from the Assailant in Fall Semester 2018, and Female Student testify that Ms. Doe never asked her to ask questions about the Assailant, evidence that now appeared to be necessary to rehabilitate Ms. Doe's credibility.

230.     On August 23, 2019, utterly devastated by the OTIX's clear bias, the Emory's unrelenting retaliation, and the new NCOs preventing her from communicating with key witnesses, Ms. Doe sent Emory an email asking to withdraw her sexual misconduct complaint against the Assailant. Acting in reliance on Seidenberg's May 9, 2019, promise that Ms. Doe would be able to reopen her case at any time, Ms. Doe stated:

> I reported because I believe this person was and is dangerous, that it was the right thing to do. The report I received from the Title IX office is disgusting. Why would anyone go through all of this—the trauma of reliving the assault, the ensuing mental health challenges, my ability to be a student, my finances, telling my parents, my relationship with my family and friends, leaving my law school--over regretting a single sexual encounter. That is a basic rape myth. The investigation does not reflect actual training in normal sexual assault response, trauma response, trauma and Emory, and victim behavior.

Emory's Title IX office has shown itself to be inequitable, unfair, deceiving, and truly harmful to victims. The worst decision of my life was accepting the Respondent's invitation to join him and a friend at a bar. The second worst decision was informing Emory about what he did to me.

I do not trust Emory with my case, and because of that, I am formally withdrawing it from your office. […]"

231. Believing that the Assailant's Complaints would have to be dismissed since they were dependent on hers, Ms. Doe did not submit responses to either Report.

232. However, on August 26, 2019, Seidenberg sent Ms. Doe an email that Emory was not halting the disciplinary process, informing her that the Assailant had submitted responses to both Reports, which would be incorporated into each of the Reports as exhibits.

## X. Emory Subjected Ms. Doe to Sexual Harassment and Retaliation by Adopting the Assailant's Responses to the Reports in Their Entirety

233. The Assailant's responses to the Reports were disturbingly angry, openly threatening, and full of irrelevant, sexually objectifying, defamatory, and often unhinged statements.

234. The Assailant called Ms. Doe's complaint "no less than a shameful and baseless display of arrogance and impudence entwined" and "unsafe and unsound conducts." The Assailant also falsely accused Ms. Doe of "repeated harassments and threats against [the Assailant] (and other students involved)."

235.    In addition to figuratively doubling down on, embellishing, and multiplying the brazenly false statements he made to the Investigators, the Assailant based his response heavily on the Reports' "credibility assessments," which he claimed were "definite determinations [that] must base [sic] the Office's expected decision to dismiss entirely her claims."

236.    The Assailant also referred to a "**third** complaint," of which Ms. Doe had no knowledge, let alone written notice.

237.    The most disturbing parts of the Assailant's responses, however, were his direct threats against both Emory and Ms. Doe:

> I pledge that **IF** [Ms. Doe's] lies in this case, will be - somehow - accepted by the Office – I will have no choice but to take legal actions, and in court – to put [Ms. Doe] on the stand, and have her try to lie the officers of the law – that in our intercourses she was never on-top of me, or that in our interactions, I never went down on her.

238.    When Ms. Doe saw the Assailant's responses, she felt not only fear and profound depression, but also hopelessness—convinced she would never escape the Assailant's retaliation and sexual predation, no matter what she did.

## Y. Emory Further Participated in and Ratified the Assailant's Retaliation and Sexual Harassment by Pursuing His Baseless Complaints

239.    On August 28, 2019, Seidenberg emailed Ms. Doe a Notice of Charges in which Seidenberg stated that Emory had decided to move forward with the Assailant's complaints against Ms. Doe alleging that she retaliated

against him in violation of the SMP. However, the Notice of Charges did not explain Seidenberg's rationale, identify what evidence she reviewed and how she weighted it, state what standard of proof she applied, or even identify what behavior Seidenberg concluded could constitute retaliation, stating only that she based her conclusion on her review of the Report.

240.    Keenly aware that Emory was threatening to compromise her ability to succeed for the rest of her life, Ms. Doe responded that she would contest the charges and undergo a hearing.

## Z. Emory Denied Ms. Doe an Adequate Opportunity to Prepare for the Hearing

241.    On September 4, 2019, when Ms. Doe realized she could no longer pay her attorney's fees, she notified Emory that she was without an advisor and asked to delay the hearing so she could find a new one.

242.    The very next day, however, Ms. Doe received notice that the hearing would take place on October 4, 2019, although Emory subsequently rescheduled the hearing for October 10.

243.     On October 4, 2019, Ms. Doe obtained a new advisor,[12] and she asked for additional time so that the advisor would be able to help her prepare her case.

244.     Seidenberg denied Ms. Doe's request for additional time until October 7, 2019, when Ms. Doe notified Seidenberg that Ms. Doe would not be able to prepare for the hearing due to a religious practice. On October 11, Seidenberg notified Ms. Doe that the hearing had been rescheduled for October 22.

245.     In the weeks leading up to the hearing, Ms. Doe exchanged email and telephone communications with Seidenberg and Emory's new University Title IX Coordinator, Yolanda Buckner ("Buckner"), in almost entirely fruitless attempts to receive OTIX responses to pressing procedural questions and concerns. However, Emory's responses were not only incomplete, but often false and in direct conflict with the SMP and federal law.

## AA. Ms. Doe Sought to Reopen Her Rape Complaint Against the Assailant

---

[12] Ms. Doe's new advisor acted solely on Ms. Doe's behalf and only conveyed Ms. Doe's thoughts or questions in communications with Emory. Thus, unless otherwise indicated, "Ms. Doe" will hereafter refer to Ms. Doe both directly and indirectly through the advisor she retained on October 4, 2019.

246.   On October 10, 2019, Ms. Doe notified Emory that she was ready to reopen her rape complaint against the Assailant, stating,

> [t]he only reason [Ms. Doe] attempted to withdraw the complaint was that [the Assailant's] and Emory's efforts to punish her for reporting were intimidating, she reasonably believed Emory's bias against her would make a just, equitable resolution process impossible, and her disabling PTSD, coupled with her move to [a new city], necessitated accommodations that Emory refused to provide.

247.   Ms. Doe also noted that Emory had not taken steps necessary to close her case. Rather, the Assailant was allowed to submit a response that Emory added to the Report for Ms. Doe's complaint and to keep pursuing his retaliatory complaints against her, even though, as Seidenberg had repeatedly stated, Ms. Doe's complaint was the basis for and inextricable from the Assailant's countercomplaints.

248.   Seidenberg responded with a verification that Ms. Doe had "adequately notified [Emory] that she wishe[d] to re-open [her sexual misconduct] Complaint," and that OTIX was "considering the next steps for re-opening her complaint."

249.   Seidenberg also stated that Emory would "promptly proceed with sending a formal Notice for both parties about the continuation of the process in [Ms. Doe's complaint]" and "follow [Emory's] Policy and protocol with regard to the timelines involved."

250.    However, when Ms. Doe asked for clarification, Seidenberg refused to identify the "protocols" she referenced. Rather, she attached a copy of the no longer operative 2018 SMP[13] and stated, "All operations, which could also be called protocols, of our office are compliant with that Policy."

## BB. Emory Denied Ms. Doe Timely, Equal Access to Crucial Case Information

251.    Ms. Doe also repeatedly submitted requests that Emory afford her her federally protected legal right to access all information used in her case, stating that she would not have an adequate opportunity to submit additional evidence or otherwise to prepare for the hearing until she was able to review the requested records. However, OTIX responded with various inconsistent, incorrect assertions and brazenly illegal actions.

252.    On several occasions, Seidenberg asserted that Emory would comply with Ms. Doe's records requests "in a timely fashion [and] abide by all applicable law and applicable policy." Seidenberg also claimed that OTIX had already "taken affirmative action" to begin gathering the records. However, Emory refused to provide Ms. Doe a specific timeline for production.

---

[13] The 2018 SMP was replaced in March of 2019. Pannell told Ms. Doe that the 2019 SMP applied to Ms. Doe's cases.

253.    On other occasions, Buckner and Seidenberg opined that Ms. Doe's requests were "overly broad" and that they would only grant her access to individual records that she could specifically identify.

254.    Ms. Doe responded by reminding Buckner and Seidenberg that the Clery Act does not offer IHEs exemptions from giving parties access to case records because the schools believe the records would be voluminous.

255.    Nevertheless, in the interest of time, Ms. Doe did identify a number of individual records that the Reports referenced but did not include, for example the Assailant's alleged screenshots of Ms. Doe's Facebook page or an email from the Assailant's advisor on March 20, 2019. She also created a list of very specific categories of records she needed to access, for example Emory's emails with the Assailant about the case and intra-office emails on the subject.

256.    In fact, during a phone meeting with Buckner and Seidenberg on October 17, 2019, Ms. Doe answered questions about each of her records requests. However, she also reminded Buckner and Seidenberg that it would be impossible for her to guess what other information existed given Emory's lack of transparency in the disciplinary process.

257.    The next day, Seidenberg sent Ms. Doe an email in which she appeared to promise Ms. Doe access to the records she requested, thanking her for clarifying her requests, which Seidenberg then outlined in her own words.

258.    Subsequently, however, OTIX began claiming that any records Ms. Doe requested would automatically be published as evidence in the Box folder[14] Seidenberg created for the Reports and appendices before Ms. Doe could review the information and decide whether she in fact wished to submit it as evidence. The Assailant and the case adjudicators also had ongoing access to the folder.

259.    On other occasions, Emory claimed that it had no obligation to provide Ms. Doe access to any records other than the Reports, the exhibits that investigators arbitrarily chose to include in the Reports and new evidence the parties submitted for the hearing.

260.    One instance, Seidenberg inexplicably claimed that Emory could treat Ms. Doe's Clery Act requests for records as FERPA requests, which, according to Seidenberg, would allow Emory to redact the records extensively and withhold them until over a month had passed since the hearing was held.

261.    To this day, Emory still has not produced the vast majority of the records Ms. Doe has been legally entitled to access.

**CC. Emory Continued Refusing to Provide Ms. Doe Notice of the Complaints Against Her**

---

[14] "Box is a single, secure, easy-to-use platform built for the entire content lifecycle, from file creation and sharing, to co-editing, signature, classification, and retention." https://www.box.com/overview.

262.     During the weeks leading up to the hearing, Ms. Doe repeatedly requested Clery Act-compliant written notices of for all of the Assailant's OTIX complaints against her, as well as Emory's decisions in those matters.

263.     However, Emory never issued Ms. Doe written notice for any of the complaints the Assailant submitted against her after his March 20, 2019, complaint regarding Mr. Doe's call, for example the April 8th Complaint, his mysterious "**third** complaint," and any other complaints the Assailant or others submitted against her.

264.     Seidenberg and Buckner consistently responded to Ms. Doe's notice requests by falsely "confirming […] that Ms. Doe [had] been formerly noticed of all formal Complaints made against her in this matter," although the reasons they gave for that "confirmation" varied significantly.

265.     Ms. Doe responded that the Report for the Assailant's complaints explicitly discussed and reached "conclusions" concerning his April 8th, Complaint, which Oddman identified as the "second violation" of the NCO he had reported in her July 1, 2019, amended questions. Moreover, the Assailant stated in his response to the Reports that he filed a third complaint, and the Notice of Charges Seidenberg issued offered no descriptions of the conduct that would be at issue in the hearing.

266.    Seidenberg also incorrectly claimed that the August 28, 2019, Notice of Charges she sent Ms. Doe complied with the Clery Act notice standards—including the requirements that a notice describe the decisionmakers' rationales and how they weighted what evidence—because the Notice "ma[de] it clear that the decision on the charge of Retaliation was made based wholly on the information contained in the Final Investigative Report."

267.    Indeed, Seidenberg refused to answer even Ms. Doe's most basic question: whether the hearing board would only consider the Assailant's allegations concerning Mr. Doe's telephone call.

268.    Ms. Doe also never received a plausible response to her questions about Male Student A's and Female Student's alleged sexual misconduct complaints against Ms. Doe that the August 2019 NCOs explicitly identified as the orders' bases. Ms. Doe also pointed out that, on the other hand, the Assailant's response alleged that he had filed the complaints requesting NCOs for Male Student A and Female Student and that Ms. Doe was "harassing" and retaliating against the Assailant by "harassing" witnesses.

269.    Nevertheless, come October, OTIX began claiming that there were not, in fact, any new complaints filed for the NCOs, which were, according to Buckner, "interim measures."

270.     When Ms. Doe asked which existing complaint provided the basis for the "interim measures," Seidenberg and Buckner refused to answer. However, Buckner stated that Emory had the authority to issue NCOs against Ms. Doe after Ms. Doe had decided to enroll at a new university because her decision to reopen her sexual misconduct complaint, which she filed while still enrolled at Emory, rendered her an "Emory Affiliated Individual."

## DD. Emory Did Not Allow Ms. Doe to Participate Meaningfully in the Hearing

271.     According to the SMP, parties were entitled to call any witnesses that could provide "relevant" testimony, the only exception being character witnesses, since the Hearing Board[15] would supposedly presume all participants, except for Ms. Doe, were of good character.

272.     OTIX's continued refusal to provide the definition of "relevant" Emory used in sexual misconduct cases became particularly obstructive when the Hearing Board Chair ("the Chair") claimed that none of Ms. Doe's witnesses could provide relevant testimony because, according to the Chair, they did not have "direct knowledge" of the unspecified events under consideration.

---

[15] Emory appoints a "Hearing Board" to adjudicate at SMP hearings. Hearing Boards have three members, including a Chair, who are Emory faculty, staff, or graduate/professional students.

273. On the other hand, the Chair allowed the Assailant to call all of the witnesses the Assailant requested.

274. The Board also chose to call witnesses independently, including Female Student, who only had "direct knowledge" concerning the complaints the Assailant filed after his March 20th Complaint.

## EE. Emory Attempted to Deny Responsibility for Inequitable Treatment by Delegating Procedural Decisions to Hearing Boards

275. One of OTIX's practices that rendered it impossible for Ms. Doe to prepare adequately for the hearing was the degree to which it claimed to delegate authority to hearing boards chairs, each of whom imposed substantially varied procedural requirements absent from the SMP.

276. Moreover, Emory frequently did not allow parties to ask chairs pre-hearing questions. For example, OTIX refused to allow Ms. Doe to request accommodations for PTSD—to be allowed not to listen to the Assailant speaking with her advisor listening on her behalf—until the day of the hearing, which meant that Ms. Doe had to ask the Chair directly and comply with whatever decision he reached in the moment. At first, OTIX suggested that Ms. Doe would need to make her request in front of the Assailant as well. However, OTIX ultimately allowed Ms. Doe to present her accommodations request during a hearing recess, a privilege required under the Clery Act.

277.    Prior to the hearing, OTIX also stated that only the Chair could inform Ms. Doe about other important procedural requirements, such as how long her opening statement could be[16] or whether a portion of the hearing in which the parties were required to justify or object to the evidence submitted, which had surprised complainants in other cases.

278.    In fact, OTIX went so far as to claim that it had so little control over the chairs' decisions that it could not prevent them from diverging from Emory Policy or protocols. Thus, when the day of the hearing arrived, Ms. Doe had almost no idea what to expect.

**FF. Emory Treated Ms. Doe Inequitably During the Hearing**

279.    When the hearing began on October 22, 2019, Ms. Doe immediately became terrified, even though both parties were participating via Zoom. The Assailant was not only verbally abusive to nearly all participants, including the Chair, and especially to Ms. Doe and Female Student, but also physically intimidating with wild gesticulations and undisguised hatred for Ms. Doe.

280.    The Assailant immediately launched a violent tirade about what evidence or testimony he personally would "not accept," for example any "new

---

[16] At least one Emory hearing board chair would only allow five-minute statements and cut off a complainant while she was speaking.

information" or statements about the rapes. The Assailant also repeatedly threatened to sue Ms. Doe and Emory or "call OCR," ordering the Board, "Try to stick to the rules!"

281.   However, the most traumatic aspect of the hearing was that the Assailant would interrupt Ms. Doe when she was asking the Chair questions or testifying, often by calling her names like "liar" or telling her he would not "allow" her to participate in a hearing procedure, for example submitting written questions for Male Student A, who refused to attend.

282.   Although the Chair told the Assailant to stop interrupting and that the Assailant would not be allowed to participate in the hearing if he continued, the Assailant persisted with impunity.

283.   One of the more bizarre aspects of the SMP was its edict that hearings were to be "nonadversarial in nature"—even though proceedings consisted of two sides with opposing interests presenting cases against one another. The Chair interpreted this fiction as prohibiting Ms. Doe from identifying the Assailant as her "rapist" or "assailant." Indeed, he instructed her not even to mention that the Assailant raped her. When the Chair interrupted Ms. Doe's opening statement to prohibit use of this factually accurate language, Ms. Doe began sobbing and pleaded with the Chair to let her tell the truth.

However, he threatened to expel her from the hearing if she continued to identify the Assailant as who he was to her.

284.    When the Assailant heard Ms. Doe begin crying, he broke in to say, "Unbelievable!"

285.    Before opening statements, Ms. Doe asked the Chair if he could explain to her which events were under consideration. Appearing surprised, the Chair refused to state whether they would consider anything that the Assailant alleged occurred after the March 20, 2019, phone call. Instead, the Chair referred Ms. Doe back to the Notice of Charges, which, of course, also did not identify the alleged conduct at issue. The Chair also could not to define "relevant."

286.    When the Assailant began his opening statement, Ms. Doe learned for the first time that he had been allowed to submit a written statement to the Board before the hearing. Ms. Doe, however, was not allowed to submit a statement prior to the hearing, nor had she received access to the Assailant's.

287.    The Assailant's opening statement was a frightening, baseless moral indictment of Ms. Doe, claiming that Ms. Doe forced him to leave the country and "dragged her feet" in the investigation so she could transfer without the new university "knowing her background" because, "She knew she was guilty." He also opined that she should be held "strictly liable" for retaliation because she

gave Mr. Doe the Assailant's number and did not tell Female Student to stop asking questions about the Assailant.

288.    When the Assailant's opening statement ran over half an hour, the Chair asked if the Assailant would "mind" saving his "request for disciplinary actions" for the closing statement, saying, "I've looked at [the request for disciplinary actions in the written opening statement], and I think it would go well in the closing statement as well, if that's OK with you."

289.    After the opening statements, the Chair decided that he would call a witness to testify before allowing the parties to do so, and he called Female Student.

290.    Female Student immediately asked the Chair to explain what "the incident in question" was. The Chair responded that the April 7, 2019, incident could constitute retaliation because Female Student was allegedly "talking to people about [the Assailant]" and "texting with [Ms. Doe] at the same time."

291.    Female Student immediately responded that Ms. Doe did not ask her to do anything, a statement the Investigators inexplicably failed to request.

292.    The Assailant interrupted Female Student's frequently, yelling that she was speaking too quickly because she knew that he would not like it.

293.    When the parties submitted questions for Female Student, the Chair decided to conclude the hearing for the day, which Emory had, despite Ms. Doe's objection, scheduled for only three hours, and continue the matter at future date.

## GG. Emory Ignored Guidance from the Federal Government

294.    When the first day of the hearing ended, the CACD Official sent an email to Seidenberg, Buckner, and Ms. Doe remarking, "Even at this late date, there seems to be some confusion about the charges to be adjudicated," and he asked if Emory could "amend the notice and advise the hearing board that there is no allegation of sexual harassment and clarify that this is really about a single phone call made by a third party."

295.    The Official also stated that parties in cases like Ms. Doe's "must be able to access documents that will allow them to fully vindicate their claims and positions and participate fully and fairly," and that this right is particularly important in Ms. Doe's situation because "the report include[d] so many extraneous facts."

296.    Shortly after receiving CACD's email, Ms. Doe emailed Seidenberg repeating her request for records, including the Assailant's written opening statement. However, Seidenberg responded that Ms. Doe could only access the Assailant's written statement if Ms. Doe submitted her own written statement

because "the guidelines" required that an adjudicatory proceeding "should be

equally available to the other party"; since Ms. Doe had not been given an

opportunity to submit a written statement, she also would not be able to access

the Assailant's statement.

297.   Buckner did not respond to the Official's October 22 message until

October 24, when she sent an email in which she appeared to strike out against

the Official personally and reiterated Emory's unsupportable position that it did

not need to clarify the scope of the retaliation complaint.

298.   Buckner also repeated her claim that Ms. Doe was only entitled to

access records that OTIX had decided to include in the Box folder.

299.   Later that afternoon, Ms. Doe discovered that Emory had revoked

her ability to download records from the Box folder and reported the problem to

Seidenberg.

300.   On October 25, 2019, Ms. Doe emailed OTIX and the Official an

outline of the reasons the charges at issue were not clear to any of the hearing

participants, including the Board: 1) the Report addressed incidents that

occurred after March 20, 2019; 2) the Assailant claimed he filed at least three

additional complaints, including the August 16 complaint that resulted in NCOs

for Male Student A and Female Student; 3) the August 28, 2019, notice of charges

did not specify what alleged conduct would be considered; 4) OTIX refused to

specify what alleged conduct would be considered at the hearing when Ms. Doe asked them directly; 5) the hearing notice stated that Ms. Doe was charged with "Retaliation/Sexual Harassment"; 6) the Chair explicitly told Female Student, who was not present during the March 20 incident, that the April 7 incident could constitute retaliation; and 7) the Chair personally called Female Student to testify, despite his "direct knowledge" requirement.

301.    Keenly aware that she was being denied notice the Assailant's complaints due to bias against her sex, Ms. Doe asked OTIX if Emory would consider notice for one rape sufficient when a hearing also concerned rapes that happened subsequently.

302.    Finally, on October 28, 2019, Seidenberg emailed an amended Notice of Hearing stating, "To clarify, the scope of the single formal charge of Retaliation, which derived from the review of the Report of Investigation and the Appendices attached thereto, is based on the alleged phone call referenced above and the potential retaliatory effects of that alleged phone call." However, as later became evident, the hearing board did not receive the necessary clarification until Ms. Seidenberg made an announcement during the November 1, 2019, portion of the hearing.

303.    Although the amended hearing notice made the scope of the matter somewhat clearer to Ms. Doe, she asked Seidenberg to explain what she meant

by "retaliatory effects," which was not included in the SMP definition of retaliation. Ms. Doe also repeated her request that Seidenberg explain Emory's definition of "relevant."

304.    Seidenberg only responded, "The term 'potential retaliatory effects,' relates directly to the allegations (quoted from the March 27, 2019 Notice of Allegations) and to [the Emory] policy definition [of retaliation]." Seidenberg also stated that Emory used the "'Reasonable Person' standard" as her definition of "relevance."

305.    On October 30, 2019, in response to Ms. Doe's renewed her request for an explanation of Emory's authority to issue NCOs against her in August 2019, Buckner stated, "It is not [the University's] policy or practice to issue no contact orders to non-Emory affiliated individuals" such as Mr. Doe, Ms. Doe was "in the category of an individual affiliated with Emory. Further, [Ms. Doe] was a student during the initiation of this process. Additionally, she has requested that we re-open a complaint she previously filed with Emory University."

### HH. Emory Made False Statements and Promises to the Department

306.    On October 31, 2019, in light of Emory's refusal to answer Ms. Doe's questions or grant her access case records, the CACD Official conducted a telephone meeting with Ms. Doe's advisor, Buckner, Seidenberg, Pannell, and

Jonathan Poole from Emory's General Counsel's Office. The Official's stated purpose was to provide informal guidance to help Emory and Ms. Doe resolve their disputes without resorting to the formal complaint process, not to reach any determinations whether Emory was in compliance with the Clery Act.

307.    One issue addressed during the call was Emory's failure to give Ms. Doe notice of all but one of the complaints against her. Again, Buckner and Seidenberg claimed that Ms. Doe had received notice of all the Assailant's complaints when they sent her the March 27th Notice and that there were no other "pending formal complaints."

308.    Ms. Doe's advisor countered that the Report dealt specifically with post-March 27 complaints, and the Assailant enumerated at least three complaints in his response to the Report and hearing testimony, including the complaint that he submitted on August 16, 2019, that led Seidenberg to issue NCOs prohibiting Ms. Doe from speaking to two key witnesses.

309.    Buckner responded by suggesting that Ms. Doe did not have a right to access any of the complaints the Assailant's submitted after March 20, 2019, because the Assailant and Ms. Doe's advisor were, according to Buckner, incorrectly using "'complaint' synonymously with 'supporting evidence,'" even though the Report, the Chair, Seidenberg, and Buckner had all at some point also called the complaints "complaints."

310.     When asked if Male Student A and Female Student had independently requested NCOs against Ms. Doe, Seidenberg said that, consistent with the Assailant's testimony, Seidenberg "confirmed" with the witnesses that they were "concerned" and were interested in NCOs. However, Seidenberg's answer later morphed into a claim that both Female Student and Male Student A contacted Seidenberg to request NCOs without prompting from anyone.[17]

311.     The Official observed that Ms. Doe appeared only to have received notice for the Assailant's March 20th Complaint and agreed that she would not be able to respond to statements against her without notice.

312.     When Ms. Doe's advisor stated that it was also unreasonable for Ms. Doe not to be notified ahead of time what procedures the hearing would involve, for example whether there would be an evidentiary sub-hearing, and the Official stated that the Clery Act requires that schools notify parties what procedures a hearing would entail.

313.     When asked whether Emory's definition of "relevance" included a "direct knowledge" requirement, Seidenberg said that was "not language [OTIX] used." However, Ms. Doe's advisor reminded Seidenberg that the Chair had

---

[17] As will be discussed *infra*, the Assailant later testified that he personally had contacted Seidenberg to report Ms. Doe for harassing him by proxy through Female Student and Male Student A, and that Seidenberg followed up with the witnesses to initiate the NCOs the Assailant requested for them.

explicitly stated that Ms. Doe's witnesses could not provide "relevant" testimony because they did not have "direct knowledge" of the events under consideration.

314.    Seidenberg then quickly shifted her position, stating, "We carefully try to stay in our lane with regard to what the hearing board does."

315.    The Official remarked that Emory's delegation of authority to its hearing board was unusual.

316.    When the Official suggested that Emory needed to clarify the nature of the charges to the Board, Poole stated that Ms. Doe should wait until the next portion of the hearing, see whether the Chair allows questions outside the scope of the March 20th Complaint, and communicate the irrelevance of the subsequent allegations in the questions she submitted and her closing statement.

317.    However, the Official disagreed.

318.    When the Official raised the issue of outstanding record requests, he stated that there appeared to be a substantial amount of case information excluded from the Box folder that the Clery Act would typically require a school to produce, including records concerning the issues or events referenced in the Report and threats or complaints from the other party.

319.    The Official observed that the Report complicated "what should have been a simple case" by inserting extraneous information and commentaries about the Assailant's post-March 20, 2019 complaints.

320.    The Official also stated that CACD had observed a trend among universities to facilitate retaliatory acts by alleged sexual violence perpetrators by investigating and adjudicating obviously baseless countercomplaints.

321.    Noting that the Assailant's March 20th Complaint concerned a single unauthorized call by a third party, the Official stated, "I've never seen such a case brought, and, if I have, certainly I've never seen such a claim vindicated."

322.    Additionally, the Official asked whether Emory's policy required Ms. Doe to submit her own written statement to access the Assailant's and that the records Ms. Doe requested would automatically be submitted as evidence to the hearing board and disclosed to the opposing party.

323.    Contrary to OTIX's previous statements, Poole promised that Emory would immediately add the Assailant's written opening statement to the Box folder, and Buckner stated that OTIX would only upload records that parties asked to submit as evidence.

324.    When the Official stated that it appeared Emory had not given Ms. Doe access to sufficient case information, Buckner had openly admitted that Emory was obligated to produce records referenced in the Report.

325.    When Ms. Doe's advisor stated that timeliness was a serious issue with Emory's refusal to produce the requested records given that the second part

of the hearing would occur the following morning, the Official noted that one of the Clery Act's purposes was to prevent schools from waiting until the last minute to provide parties access to large amounts of information.

326. In response, Buckner and Seidenberg promised that Emory would produce all relevant records, including the Assailant's written statement, immediately if Ms. Doe forwarded them her past records requests or sent them a new, detailed list of requested materials.

327. Notably, Buckner explicitly stated that Ms. Doe "most definitely [could]" pursue her rape complaint because she was "Emory affiliated" as a participant in their proceedings.

## II. Emory Ignored CACD Guidance and Continued Denying Ms. Doe Access to Crucial Case Information

328. At 1:05 p.m., immediately after the phone call with CACD, Ms. Doe forwarded OTIX her past requests for records and included a compiled list of twelve extremely specific requests for highly probative records, for example, "the emails to which [the Assailant's] advisor refer[ed] in her 3/20/19 email to [Pannell] regarding [the Assailant's] desire to file a complaint against [Ms. Doe]." In an attempt to prevent Emory's usual dilatory requests for clarification, Ms. Doe asked OTIX to notify her immediately if they had any questions.

329.     At 5:39 p.m., when Emory still had not responded, Ms. Doe asked

Seidenberg again when she would be able to access the requested records.

However, at 5:48 p.m., Seidenberg responded that she had not yet prepared the

materials.

330.     When Emory still had not produced the records at 6:47 p.m., Ms.

Doe requested that OTIX postpone the second day of the hearing to "prevent a

significant number of egregious violations of both parties' federally protected

legal rights."

331.     However, Buckner claimed that postponing the rest of the hearing

would destroy "the integrity of [Emory's] process" and that moving forward as

scheduled would "not eliminate [Ms. Doe's] ability to address [her] concerns at a

later time."

332.     At 9:50 p.m., when Emory still had not produced the requested

records, Ms. Doe reiterated that she would not have an adequate opportunity to

prepare for the hearing, even though she had done exactly what she promised to

do during the call with CACD.

333.     Incomprehensibly, at 11:35 p.m., Seidenberg emailed Ms. Doe a

response in which Seidenberg appeared to have ignored everything that had

transpired for the past month:

Please provide us with a specific list of the records you allege we have not produced (to which you are certain you do not already have access), by date or recipient if possible, or that we have explained why we cannot produce and your reasoning as to the specific legal reason in opposition to our stance.  […]  Broad requests can only be answered with requests for clarification.  Please advise promptly. […] We have asked for many clarifications in good faith.

334.     At 12:36 a.m. on November 1, 2019, just hours before the hearing was to begin, Ms. Doe responded in desperation that she had, in fact, already provided a very specific list, and no one at Emory had sent her a denial of any of her requests.

335.     However, Emory did not reply.

## JJ. The Second Day of the Hearing Revealed Additional Violations of Ms. Doe's Legal Rights

336.     When the second part of the hearing began on November 1, 2019, Ms. Doe asked that the Board exclude all evidence or testimony unrelated to Mr. Doe's call. However, it immediately became evident that the Chair did not understand that Mr. Doe's call was the only alleged conduct at issue when he stated that the Board had thus far limited the hearing to information related to the charges articulated in the notice of charges.

337.     Then, Seidenberg stated that she needed to "clarify the scope of the single charge of retaliation" to the Hearing Board and parties simultaneously, and she read out loud,

The scope of the single formal charge of retaliation, which derived from a review of the report of investigation and the appendices attached thereto, is based on the alleged phone call referenced and the potential retaliatory effects of that alleged phone call.

338.    The shock on the Hearing Board's faces was immediately apparent, and the Chair called for a break for a discussion among the members "off the record."

339.    The Assailant, on the other hand, objected to what he termed Ms. Doe's "interpretation of the scope of the investigation," claiming it was "not [his] fault" that Emory failed to notify Ms. Doe notice of his other charges, which he apparently believed resulted in Seidenberg's clarification.

340.    Although the Assailant continued abusively interrupting participants as he did on the first day, a new issue also arose: the Chair claimed that the vast majority of the questions Ms. Doe submitted for the Assailant and witnesses were "not relevant as to whether or not retaliation occurred," including inquiries concerning the basic elements of a retaliation charge.

341.    For example, Ms. Doe was not allowed to ask the Assailant to explain what he alleged was the causal connection between the call and the Assailant's participation in a Title IX investigation and whether the Assailant's reaction to the call was impacted by his stated belief that people of Mr. Doe's ethnicity were violent.

342.    Ms. Doe was also not allowed to ask other questions concerning the perpetrator's and witnesses' credibility, how long after the call the Assailant filed his reports, and whether he had already bought his plane ticket home when Mr. Doe called.

343.    The Chair also rejected nearly all of Ms. Doe's questions concerning the Assailant's prior inconsistent statements that appeared in the Report.

344.    Ms. Doe faced the same obstructions to questions for the witnesses who testified, Male Student B and Male Student C. For example, the Chair refused to ask whether the Assailant influenced the written statements the witnesses submitted to OTIX or whether the witnesses knew the nature of Ms. Doe's complaint against the Assailant.

345.    Nevertheless, the Assailant's and his witnesses' testimony still included many statements that demonstrated the Report's implausibility.

346.    For example, Male Student B testified that Mr. Doe did not make any direct threats and that he incorrectly believed Ms. Doe had gone on a date with the Assailant and her complaint against him only concerned the Assailant's lack of suaveness.

347.    Male Student C, on the other hand, blatantly misrepresented the call during his testimony, often directly contradicting the recording. For example, he claimed that Mr. Doe said he would "come down there" if the Assailant stayed in

school with the addendum and that Mr. Doe told the Assailant, "I can make your life hell and harm you in one way or another," because Mr. Doe "[knew] the kind of community [the Assailant] belongs to."

348.    Male Student C also admitted that the Assailant claimed Mr. Doe was dangerous due to his ethnicity and that the Assailant had already been planning to return to his home company to take care of his ailing parents when the call occurred.

349.    The Assailant's testimony, however, included even more information that supported Ms. Doe's case. Although he at times refused to answer questions because he personally did not believe they were relevant, he did make many statements that contradicted his previous testimony and made absurdly implausible claims about Ms. Doe's dangerousness.

350.    Furthermore, the Assailant testified that Pannell "urged him" to file complaints against Ms. Doe and edited the audio recording on the Assailant's behalf to exclude a conversation that occurred after the call.

351.    At after both witnesses had testified, the Chair asked the parties to submit their closing statements in writing to avoid prolonging the hearing. The Chair stated that the parties would receive the "unavailable witnesses" answers to the parties' written questions by November 6, 2019, after which the parties would have forty-eight hours to submit their closing statements.

**KK. After the Hearing, Emory Redoubled Its Efforts to Retaliate Against Ms. Doe and Deny Her the Right to a Prompt, Equitable Resolution of the Complaints**

352.    On November 4, 2019, the CACD Official emailed OTIX that he was "a bit concerned about some of the procedural bumps in the road that have surfaced in this case," including that Seidenberg had to "explain the charge at issue to the hearing board during the proceeding," and he suggested, "it would be helpful if [Ms. Doe and her advisor] could get the information they are seeking, including a schedule for the unfinished business related to the hearing [...] with as much lead time as possible."

353.    The next day, on November 5, 2019, Emory escalated its campaign to cover up Ms. Doe's case.

354.    At 10:45 a.m., the Emory Police Department sent Ms. Doe an email refusing to allow her to access the case records for the Assailant's complaint against Mr. Doe because the file was "associated with a criminal investigation that [was] still open."

355.    At 11:28 a.m., especially concerned given the Assailant's recent threats and Emory's refusal to allow her to access Emory Police records, Ms. Doe asked to schedule a call with OTIX and CACD to discuss the University's continued refusal to produce the records she requested or explain what the remaining procedures for adjudication would entail.

356.    However, at 2:39 p.m., Seidenberg sent Ms. Doe an email stating that the Assailant had "withdrawn his complaint," which was "now closed."

357.    At 3:30 p.m., the CACD Official responded, "The information that [Ms. Doe has] shared is deeply concerning." The Official also stated,

> The Department's interest at this stage is first and foremost to protect students, to ensure the integrity of the process established by the Clery Act, and to protect the rights of both parties to participate fully in a fair hearing process. The third point is precisely why we are always concerned about the timing and adequacy of notices and the mechanics of the hearing process.

358.    The Official noted that in the October 31, 2019, call, Emory "represented that they were in the process of producing additional documents and information for [Ms. Doe's] review." He suggested that Emory be given until the following morning to produce the requested records and that they would not need to hold a phone meeting "[i]f the material produced address[ed] [Ms. Doe's] outstanding concerns."

359.    However, Emory chose not to produce any additional records. Instead, on November 6, 2019, Buckner responded that the CACD Official's email was "disappointing" because Emory had "worked tirelessly to respond to [Ms. Doe's] numerous requests, as well as [the CACD Official's] concerns."

360.    However, Buckner admitted that Emory simply "did not address" record requests that she unilaterally decided were "overly broad or outside the scope of the information that would be considered during the hearing."

361.    Despite the fact that a federal official tasked with enforcing the Clery Act had explicitly stated that Emory had not disclosed many of the records Ms. Doe was entitled to access, and despite the fact that Ms. Doe immediately provided an even more specific list of requests, Buckner incomprehensibly proclaimed that Emory was "not aware of any outstanding Clery requests."

362.    However, Buckner ventured even further from statements she made during the October 31 call: she claimed that Ms. Doe's complaint against the Assailant was now "closed, per [Ms. Doe's] request." Buckner did, however, state that OTIX "would be happy to continue [their] communications" about the matters if there were "any further questions or concerns."

363.    Shocked, Ms. Doe responded immediately by requesting that Buckner provide a Clery-Act compliant description of her rationale for claiming she could close Ms. Doe's complaint so that Ms. Doe could appeal this erroneous outcome.

364.    Ms. Doe reminded Buckner that: 1) Emory's policy did not prohibit reopening complaints; 2) Emory had explicitly told Ms. Doe she *could* reopen her complaint; 3) Ms. Doe had only temporarily closed her complaint "due to

retaliation and severe PTSD"; and 4) Emory never notified Ms. Doe that it was denying her request to reopen her complaint.

365.    On November 7, 2019, Buckner responded by making the situation even less clear, appearing to claim Ms. Doe's rape complaint's validity depended on the Assailant's retaliatory complaint against her. However, Buckner also stated that Emory Policy did not "preclude any party from filing another complaint in the future," although Buckner made the intimidating claim that Ms. Doe would now need to present her case again and undergo a new investigation.

366.    On November 8, 2019, Ms. Doe responded again expressing her objections to Bucker's misrepresentation of what transpired, and she attached the email Buckner had just days before stating that Emory could issue NCOs against Ms. Doe in August because Ms. Doe reopened her rape complaint, which she filed while still enrolled at Emory.

367.    Shortly thereafter, the CACD Official suggested that the group schedule another phone meeting in the near future to go through the document requests to identify "areas where documents exist and those where they do not."

368.    On November 12, 2019, Buckner responded incomprehensibly by asking, with no basis, if the CACD Official still wanted to hold a call "[c]onsidering the changed circumstances which both parties' request to close these matters."

369.   Again, Ms. Doe responded immediately by reminding Buckner of her appeal arguments, and she stated, "Emory must not only stop retaliating, but must also remedy the effects of that retaliation." Ms. Doe also reminded Bucker that the Clery Act does not include a time limit for access to case information, including when parties are submitting appeals.

370.   On November 19, 2019, the CACD Official, referring to updates he received both from Ms. Doe and Emory, repeated his request to schedule another phone meeting the following afternoon to address the validity of Buckner's claim that she could close Ms. Doe's complaint to the events that led Ms. Doe to temporarily close her case, as well as Emory's continued refusal to produce requested documents.

371.   On November 20, 2019, Buckner asked to schedule the call the CACD Official requested for the following week.

372.   Ms. Doe was subsequently informed that CACD would need to speak with Emory separately.

373.   Months later, Ms. Doe learned that Emory entered an agreement with the Department on December 18, 2019, to conduct an internal appellate review of her case and to begin remedying the effects of any failures to comply with Title IX by November 30, 2019.

374.   The appeal of Ms. Doe's complaint is apparently still pending.

375.     However, despite the many glaring instances of Emory's discrimination against Ms. Doe's due to her sex, the University has yet to do anything to remedy the staggering harms she experienced because she reported being raped.

376.     In February 2021, Ms. Doe submitted a formal complaint to the Department along with two other women—Jane Roe and Jane Loe—who experienced almost identical gender animus, inequitable treatment, and retaliation when they reported sexual violence. That complaint is still pending.

## LL. Ms. Doe Continues to Suffer Extraordinary Hardship Due to Emory's Discriminatory Conduct

377.     Often haunted by flashbacks and hypervigilance, Ms. Doe continues to live with PTSD due not only to the Assailant's sexual violence, but also to Emory's deliberately indifferent, retaliatory, and profoundly discriminatory response to her decision to tell the truth.

378.     Moreover, although Ms. Doe proudly graduated from her new law school in May 2021, the part of her transcript that Emory controlled continues to limit her job prospects significantly.

379.     Indeed, Ms. Doe continued to require accommodations at her new university as she struggled to recover from PTSD and threw herself into trying to compensate for the grades she received during her first two semesters of law

school due to the insurmountable obstacles Emory built for her as it made her life

so unbearable that she had to complete the rest of her coursework elsewhere.

380.    Due to the impact Emory's discrimination had on her academic

performance, and given that Emory forced her to forfeit her ability to participate

in programs like Law Review in exchange for basic accommodations, Ms. Doe's

job prospects were limited after she graduated, even though she was an A

student her final two years of law school.

381.    Moreover, Ms. Doe was forced to pay full tuition at the new

university because Emory's treatment prevented her from receiving the $23,000

scholarships Emory promised to provide her every year.

382.    Thus, Ms. Doe had to take out a staggering amount of loans not only

to complete law school, but also to pay her advisor's attorney's fees.

## V. CAUSES OF ACTION

### COUNT I
### Violation of Title IX, 20 U.S.C. § 1681(a) - Deliberate Indifference

383.    Title IX provides that "[n]o person in the United States shall, on the

basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving

Federal financial assistance." 20 U.S.C § 1681(a).

384.    Defendant Emory University is a recipient of federal funding and therefore subject to the provisions of Title IX.

385.    Beginning on August 18, 2018, and continuing through November 2019, Ms. Doe—an Emory Law student—experienced sexual harassment from the Assailant—an Emory Law student and Emory employee—that was sufficiently pervasive, severe, and objectively offensive to meet the requirements for Title IX actions, including repeated forcible rapes, sexual assault, persistent unwelcome sexual advances, and stalking.

386.    Furthermore, the Assailant's sexual harassment created a sexually hostile environment that encompassed the entirety of Ms. Doe's educational experience at Emory because she not only struggled with the PTSD resulting from sexual violence, but also was required to attend classes with her rapist, traverse the same areas of campus, use the same facilities, such as the Emory Law Library, and respond to his baseless, retaliatory countercomplaints.

387.    Under Title IX, the sexual harassment and resulting hostile environment that Ms. Doe suffered constituted discrimination based on sex.

388.    Furthermore, beginning on September 21, 2018, Defendant Emory University had actual notice that Ms. Doe experienced sexual harassment. Many Emory employees and agents with actual knowledge of Ms. Doe's September 21, 2018, meeting with Brokaw and her March 4, 2019, formal sexual misconduct

complaint against the Assailant—including, but not limited to, Brokaw, Pannell, Seidenberg, Buckner, Seaman, Oddman, Poole, and the Hearing Board—had the authority and ability to investigate and take meaningful corrective action to remediate the Assailant's sexual harassment and the hostile educational environment Ms. Doe suffered, but failed to do so.

389.   Moreover, from September 21, 2018, through, at the earliest, November 30, 2019, Defendant Emory University's continuous, clearly unreasonable responses to all matters and issues concerning and arising from Ms. Doe's sexual misconduct complaint constituted deliberate indifference that made Ms. Doe more vulnerable to the effects of the sexual misconduct, further sexual harassment, and other forms sex or gender discrimination.

390.   For example, Defendant Emory University and its appropriate officials:

    a.   Purposefully deviated from its policies in attempts to block Ms. Doe's complaint and appeals without completing the required disciplinary procedures;

    b.   Purposefully discouraged Ms. Doe from filing a complaint;

    c.   Purposefully shielded itself from information about an Assailant student;

    d.   Exacerbated and perpetuated Ms. Doe's PTSD by treating her cruelly and with hostility, portraying her as inferior to and less credible than her rapist, and punishing her for experiencing symptoms of PTSD;

e.  Refused to consider Ms. Doe's rape complaint separately from the Assailant's baseless, retaliatory countercomplaints;

f.  Issued inaccurate, biased Reports attacking Ms. Doe for having PTSD and believing her rapist's and his witnesses' testimony over hers despite dispositive evidence that they lacked authority, accuracy, and credibility;

g.  Demonstrated a concern for the Assailant's delusional, retaliatory demands that overrode Ms. Doe's rights to procedural equity, reasonable accommodations, effective protective measures, and a non-sexually-hostile environment;

h.  Refused to gather or consider significant evidence and testimony that supported Ms. Doe's testimony and undercut the Assailant's;

i.  Urged the Assailant to file baseless retaliatory countercomplaints against Ms. Doe and assisting and advocating for him throughout the disciplinary proceedings;

j.  Refused to give Ms. Doe adequate warning of the continuing risk the Assailant posed her and never performed a Threat Assessment Team evaluation of the Assailant;

k.  Deliberately thwarted Ms. Doe's personal attempts to protect herself from further sexual harassment by the Assailant, to obtain procedural equity, and to restore access to her education;

l.  Refused to afford Ms. Doe almost all of the reasonable accommodations she requested, thus ensuring that Ms. Doe's academic performance would suffer because she was a woman who had been raped, while meanwhile providing the Assailant with accommodations above and beyond those afforded to Ms. Doe;

m. Prohibited Ms. Doe from communicating with friends and witnesses at the Assailant's request, without any basis;

n.  Failed to provide employees with adequate training to conduct sexual misconduct disciplinary proceedings;

o.  Engaged in an illegal, continuing campaign of retaliation against Ms. Doe for engaging in Title IX-protected activities, including by encouraging the Assailant to file retaliation claims without basis and by creating NCOs where none were indicated;

p.  Chose not to cure the defects it knew existed in disciplinary proceedings, protective measures, and accommodations; and

q.  Knowingly disregarded direct guidance from and its resolution agreement with the Department.

391.  Furthermore, from September 21, 2018, through, at the earliest, November 30, 2019, Defendant Emory University's deliberately indifferent response to the sexual harassment and resulting hostile environment that Ms. Doe endured limited or denied her access to Emory's education programs and activities. For example, Defendant Emory University:

a.  Conducted its disciplinary procedures in a way that did not allow Ms. Doe to keep up in her coursework, take her exams on time, or fully benefit from her classes;

b.  Conditioned access to accommodations on Ms. Doe subjecting herself to the Assailant's baseless, retaliatory countercomplaints and forfeiting her access to important Emory education programs such as On-Campus Interviews, the Law Review Write-On Competition, and class ranking; and

c.  Forced Ms. Doe to complete the remainder of her coursework requirements for her degree at another university.

392.    Indeed, Defendant Emory University's deliberate indifference

continues via its sitting on the appellate review of her case through the present.

***Relief Sought for Count I***

393.    Due to Defendant Emory University's aforementioned deliberate

indifference to the sexual harassment Ms. Doe experienced in violation of Title

IX, Ms. Doe has suffered losses of educational opportunities and benefits, along

with injuries, damages and losses, including, but not limited to, emotional

distress, fear, anxiety, depression, and PTSD; lost scholarship money; lost past

and future earnings and earning capacity; and damage to reputation.

394.    Ms. Doe therefore respectfully demands judgment against

Defendant Emory awarding:

a) Damages in amounts to be established at trial, including, without
   limitation, reimbursement for all of Ms. Doe's tuition and related
   expenses; payment of Ms. Doe's expenses incurred as a consequence of
   the sexual harassment, sexual assault, and stalking; damages for
   deprivation of equal access to the educational benefits and opportunities
   provided by Emory; and damages for past, present, and future
   emotional pain and suffering, ongoing and severe mental anguish,
   damage to reputation, and loss of earnings and earning capacity.

b) Injunctive relief to be determined at trial requiring Emory to comply
   with federal law under Title IX;

c) Pre- and post-judgment interest;

d) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

e)  Such other relief as the Court may deem just and proper.

## <u>COUNT II</u>
### Violation of Title IX, 20 U.S.C. § 1681(a) - Retaliation

395.     Title IX prohibits retaliation against individuals who engage in Title

IX-protected activities.

396.     Emory is a recipient federal financial assistance and is therefore

subject to the provisions of Title IX.

397.     From September 21, 2018, until, at the earliest, November 30, 2019,

Emory continuously engaged in a campaign of materially adverse actions against

Ms. Doe because she engaged in Title IX-protected activities.

398.     Ms. Doe's protected activities included, for example,

a)  Reporting the Assailant's sexual misconduct, including via disclosures
    to Brokaw and a formal Title IX complaint with OTIX;

b)  Attempting to gather evidence and present her cases in sexual
    misconduct complaints by and against her; and

c)  Attempting to assert her rights to procedural equity, accommodations,
    and interim protective measures;

d)  Seeking guidance from the Department;

e)  Attempting to assert her rights under Title IX during disciplinary
    proceedings; and

f)  Testifying during a disciplinary hearing that the Assailant raped her.

399.     Emory also retaliated against Ms. Doe for activities in which she did

not engage but that would have been protected under Title IX, including

allegedly asking Female Student to gather information from Female Student's

friends concerning Ms. Doe's case.

400.    Furthermore, from September 21, 2018, until, at the earliest,

November 30, 2019, Emory engaged in a continuing campaign of taking

materially adverse actions against Ms. Doe in response to her protected activities,

including, but not limited to:

a) Denying her access to education programs and activities by refusing to
   provide the reasonable accommodations she requested;

b) Denying her the opportunity to participate in On-Campus Interviews;

c) Denying her the opportunity to participate in the Law Review Write-On
   Competition;

d) Forcing her to complete the remainder of her coursework requirements
   at a different university by making the sexually hostile environment she
   faced at Emory intolerable;

e) Denying her access to scholarship money from Fall Semester 2019
   through the Spring Semester 2021;

f) Issuing baseless NCOs against her, at the Assailant's request, that
   prohibited her from communicating with friends and witnesses;

g) Urging and assisting the Assailant to file baseless retaliatory
   countercomplaints against Ms. Doe and assisting and advocating for
   him throughout the disciplinary proceedings;

h) Enabling and encouraging the Assailant to continue to stalk and
   sexually harass Ms. Doe;

i) Subjecting Ms. Doe to excessive, malicious, and highly traumatic questioning;

j) Denying Ms. Doe an adequate opportunity to prepare for the hearing, including by repeatedly failing to provide requested case information that her Assailant could access, by failing to provide notice of the charges against her, by failing to explain how the hearing would work as required by federal law, and by creating new procedural rules on the fly that only applied to her detriment;

k) Investigating and holding a biased hearing for deeply traumatizing and baseless retaliatory charges;

l) Refusing to resolve her sexual misconduct complaint against the Assailant;

m) Forcing her to tell her professors that she was sexually violated;

n) Threatening to deny her the opportunity to participate in the hearing;

o) Issuing grossly discriminatory and defamatory Investigation Reports; and

p) Allowing the Assailant to add defamatory, threatening, and traumatizing falsehoods to the Reports; and

q) Stating that Ms. Doe could re-open her complaint even if no longer a University student and then denying her the ability to do so.

401.    These adverse actions would easily dissuade a reasonable, similarly situated individual from engaging in Title IX-protected activities because they severely damaged Ms. Doe's education, career, financial resources, and emotional wellbeing.

402.    Moreover, there was a clear causal relationship between Ms. Doe's

protected activities and adverse actions.

403.    First, all of the Emory agents and employees who took these adverse actions against Ms. Doe—including Brokaw, Pannell, Seidenberg, Buckner, Seaman, and Poole—were aware of her Title IX-protected activities, including, *inter alia*, because they received Ms. Doe's sexual misconduct complaints and requests for accommodations.

404.    Second, Emory officials who retaliated explicitly stated, both verbally and in writing, that they were taking adverse actions against Ms. Doe due to her Title IX-protected activities.

405.    Third, Emory has demonstrated a clear pattern of retaliating against female rape survivors who engage in Title IX-protected activities, including by retaliating in the same manner against Jane Roe and Jane Loe.

406.    Finally, all of the adverse actions occurred in close temporal proximity to Ms. Doe's protected activities, sometimes within hours.

*Relief Sought for Count II*

407.    Due to Emory's retaliation in violation of Title IX, Ms. Doe has suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, trauma, PTSD, and inability to concentrate; lost scholarship money; loan

repayment obligations and interest; lost past and future earnings and earning

capacity; lost career opportunities; and damage to reputation.

408.   Ms. Doe therefore respectfully demands judgment against

Defendant Emory awarding:

a) Damages in amounts to be established at trial, including, without limitation, reimbursement for all of Ms. Doe's tuition and related expenses; payment of Ms. Doe's expenses incurred as a consequence of the retaliation; damages for deprivation of equal access to the educational benefits and opportunities provided by Emory; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present, and future enjoyment of life; and loss of past, present, and future earnings and earning capacity;

b) Injunctive relief to be determined at trial requiring Emory to comply with federal law under Title IX;

c) A permanent injunction prohibiting further retaliatory conduct against Ms. Doe by Emory;

d) Pre- and post-judgment interest;

e) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

f) Such other relief as the Court may deem just and proper.

## COUNT III
### Violation of Title IX, 20 U.S.C. § 1681(a) – Erroneous Outcomes in Disciplinary Proceedings Due to Gender Bias

409.   Title IX prohibits recipients of federal financial assistance from

discriminating against individuals based on sex or gender in all education

programs and activities, including in an institution's responses to sexual misconduct complaints.

410.    Emory is a recipient federal financial assistance and is therefore subject to the provisions of Title IX.

411.    From February 21, 2018, through, at the earliest, November 30, 2019, Emory's gender bias against Ms. Doe—a female rape survivor—caused the University to reach erroneous outcomes throughout OTIX's disciplinary proceedings for Ms. Doe's complaints against her rapist, and her rapist's baseless countercomplaints against her.

412.    Ms. Doe was exceptionally qualified to be enrolled in Emory's J.D. program, for example because she earned a Bachelor of Art's degree at one of the top universities in the country and was not only admitted to Emory Law School, but also awarded large scholarships. Although her academic performance suffered as a result of Emory's deliberate indifference, she still maintained satisfactory grades and demonstrated true talent to her professors.

413.    At all relevant times, Emory operated with clear gender bias against women, especially women who had been subjected to sexual violence. Emory succumbed to widespread public pressure to protect males in sexual misconduct complaints, litigation from males accused of sexual misconduct, and legislation targeted to obstruct sexual misconduct complaints against male students, and

Emory officials—including, but not limited to, Pannell, Seidenberg, Buckner, Brokaw, Poole, and Oddman—have all made statements and engaged in actions that demonstrate a clear pattern of gender bias against women who have been raped, including, for example, by:

a. Consistently retaliating against female rape survivors, including Ms. Doe, Ms. Roe, and Ms. Loe;

b. Consistently facilitating and participating in male rapists', including the Assailant's, baseless countercomplaints against the women they raped, including Ms. Doe, Ms. Roe, and Ms. Loe;

c. Treating baseless countercomplaints from male rapists, for example the Assailant's retaliation allegations, as more serious than sexual misconduct complaints from the women they raped, including Ms. Doe's, Ms. Roe's, and Ms. Loe's complaints against their assailants, to which Emory responds with deliberate indifference;

d. Giving male rapists accommodations and protective measures that Emory denies female rape survivors, including Ms. Doe, Ms. Roe, and Ms. Loe;

e. Demonstrating a concern for the academic success and wellbeing of male rapists that overrides the needs and rights of the women they raped, including Ms. Doe, Ms. Roe, and Ms. Loe; and

f.  Presuming that male rapists are more credible than the women they raped, including Ms. Doe, Ms. Roe, and Ms. Loe, despite evidence to the contrary.

414.    Thus, there are more than ample specific facts to establish a presumption that gender discrimination played a role in Defendant Emory University's handling of disciplinary complaints by and against Ms. Doe.

415.    Furthermore, many specific facts cast doubt on the accuracy of Defendant Emory University's findings in both parties' complaints, including in procedural decisions and appeals. For example,

a.  Emory chose to investigate the Assailant's April 8th Complaint, even though the Assailant was asking them to punish Ms. Doe for allegedly engaging in what would have been a legally protected activity;

b.  The Investigators failed to interview witnesses with information supporting Ms. Doe's case—such as Female Student, one of Ms. Doe's childhood friends, and Mr. Doe—or consider evidence or statements Ms. Doe submitted;

c.  The Investigators ignored glaring inconsistencies and inaccuracies in the Assailant's and his witnesses' testimony, including prior inconsistent statements and conflicts with material evidence;

d.  The Investigators misquoted, ignored, and misrepresented Ms. Doe's testimony and evidence;

e.  The Investigators claimed that Ms. Doe's PTSD and cultural background made her less credible;

    f.   The Investigators did not consider the influence the Assailant's racism had on his allegations;

    g.   The Hearing Board Chair refused to allow Ms. Doe to identify the Assailant as her rapist or testify about the rapes;

    h.   Neither the parties nor the Hearing Board knew what conduct was under consideration at the hearing;

    i.   Emory denied Ms. Doe accommodations, which made it even more difficult for her to participate in the investigations;

    j.   The Investigators allowed the Assailant and his witnesses to read answers to previously provided questions out loud from prepared statements;

    k.   Emory refused to give Ms. Doe access to crucial case records, so she had no opportunity to gather some of the most important evidence she needed to present her case;

    l.   Emory failed to give Ms. Doe notice of many complaints, decisions, and outcomes so that she had no opportunity to present her case or respond to statements against her;

    m.  Emory immediately decided to give the Assailant accommodations, such as the option to complete coursework and exams remotely, but repeatedly refused to grant Ms. Doe's reasonable requests, which included some of the same accommodations Emory swiftly afforded the Assailant.

416.    The present outcome of Ms. Doe's complaint against the Assailant, pending appellate review, is that her complaint is considered dismissed— an incorrect outcome; Ms. Doe has repeatedly attempted to reinstitute her complaint, as Emory told her she could do, but the University has thus far refused to allow her to do so.

417.    Given the ample evidence that Emory and the administrators involved in Ms. Doe's case operated with a clear gender bias against women, and given that substantial evidence casts doubt on Emory's erroneous decisions, gender bias clearly played a role in erroneous outcomes in sexual misconduct complaints by and against Ms. Doe.

*Relief Sought for Count III*

418.    As a result of the aforementioned erroneous outcomes that violate Title IX, Ms. Doe has suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, and trauma; lost past and future earnings and earning capacity; and delays in pursuing her career.

419.    Ms. Doe therefore respectfully demands judgment against Defendant Emory awarding:

a) Damages in amounts to be established at trial, including, without limitation, reimbursement for all of Ms. Doe's tuition and related expenses; payment of Ms. Doe's expenses incurred as a consequence of the erroneous outcomes; damages for deprivation of equal access to the educational benefits and opportunities provided by Emory; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present, and future enjoyment of life; and loss of past, present, and future earnings and earning capacity;

b) Injunctive relief to be determined at trial requiring Emory to comply with federal law under Title IX;

c) Pre- and post-judgment interest;

d) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

e) Such other relief as the Court may deem just and proper.

## <u>COUNT IV</u>
**Violation of Title IX, 20 U.S.C. § 1681(a)- Selective Enforcement of University Policies Based Due to Discrimination on the Basis of Gender**

420.   Title IX prohibits recipients of federal financial assistance from discriminating against individuals based on gender in all education programs and activities, including in an institution's implementation of its disciplinary policies and proceedings.

421.   Emory is a recipient federal financial assistance and is therefore subject to the provisions of Title IX.

422.   Gender discrimination motivated Defendant Emory University's mishandling of disciplinary complaints by and against Ms. Doe from September 21, 2018, through, at the earliest, November 30, 2019, as shown throughout the Complaint. For example, Emory:

a.  Consistently retaliates against female rape survivors, including Ms. Doe, Ms. Roe, and Ms. Loe;

b.  Consistently facilitates and participates in male rapists', including the Assailant's, baseless countercomplaints against the women they raped, including Ms. Doe, Ms. Roe, and Ms. Loe;

c.  Treats baseless countercomplaints from male rapists as more serious than sexual misconduct complaints from the women they raped, including Ms. Doe's, Ms. Roe's and Ms. Loe's complaints against their assailants, to which Emory responds with deliberate indifference;

d.  Gives male rapists, including the Assailant, accommodations and protective measures that Emory denies female rape survivors, including Ms. Doe , Ms. Roe, and Ms. Loe;

e.  Demonstrating great concern for the academic success and wellbeing of male rapists, including the Assailant, that overrides the needs and rights of the women they raped, including Ms. Doe; and

f.  Presuming that male rapists, including the Assailant, are more credible than the women they raped, including Ms. Doe, despite evidence to the contrary.

423.    Furthermore, Emory treated a male comparator, the Assailant, vastly more favorably, than Ms. Doe, the woman he raped, in its responses to Ms. Doe's sexual misconduct complaint against the Assailant and the Assailant's many baseless, retaliatory countercomplaints against Ms. Doe.

424.    Ms. Doe and the Assailant were similarly situated in the matters between them:

    a.  Both were Emory Law students who even took the same classes;

    b.  Both were contractually obligated to comply with the same Emory policies and procedures;

    c.  As parties in the matters between them, each was at times a complainant and at other times a respondent; and

    d.  Neither was enrolled in classes at Emory during Fall Semester 2019, but both were still "Emory-affiliated" individuals participating in an Emory education program or activity: sexual misconduct disciplinary procedures.

425.    However, Defendant Emory University treated Ms. Doe less favorably than the Assailant. For example:

    a)  Brokaw, Pannell, Seidenberg, and Buckner all took steps to discourage or block Ms. Doe from filing or proceeding with her rape complaint against the Assailant. However, Pannell and Emory Police "urged" the Assailant to file baseless, retaliatory countercomplaints against Ms. Doe.

    b)  While Emory gave the Assailant notice of all complaints against him, it only gave Ms. Doe notice of one of the Assailant's many complaints.

    c)  Emory gave the Assailant, but not Ms. Doe, adequate opportunity to add personal responses to the Reports.

d) Although Emory refused to afford Ms. Doe a hearing for her well-founded complaint against the Assailant, the University did hold a hearing for the Assailant's baseless countercomplaints.

e) Pannell edited the Assailant's audio recording on his behalf to remove potentially damaging conversation after Mr. Doe's call, but Pannell did not edit any evidence on Ms. Doe's behalf.

f) The investigators for Ms. Doe's and the Assailant's sexual misconduct complaints ignored the many inconsistencies in the Assailant's and his witnesses' statements but fabricated supposed inconsistencies in Ms. Doe's consistent testimony.

g) Investigators claimed that Ms. Doe lacked credibility for showing classic symptoms of PTSD but turned a blind eye to Assailant's racist, aggressive, enraged, and pathologically paranoid behavior.

h) Investigators blamed Ms. Doe for being unable to obtain pictures from Lyft of the Assailant's vomit quickly enough but ignored the fact that the Assailant never produced the Facebook screenshots he referenced in his testimony.

i) Emory performed a Threat Assessment Team evaluation after the Assailant's retaliation, harassment, and NCO violation complaints against Ms. Doe, but not for Ms. Doe's rape and sexual assault complaints against the Assailant.

j) Emory allowed the Assailant to submit a written opening statement to the hearing board, which the board reviewed before the hearing, without offering Ms. Doe that option.

k) While Pannell notified the Assailant of Ms. Doe's complaint on March 5, 2019, the morning after she filed it, Emory waited a full week, until March 27, 2019, to give Ms. Doe notice of the Assailant's March 20, 2019, complaint, even though administrators communicated with Ms. Doe about her case during the week that only they, and not Ms. Doe, had knowledge of the Assailant's complaint.

l) Emory refused to give Ms. Doe access to many case records that the University and/or the Assailant could access.

m) Emory issued baseless NCOs at the Assailant's request preventing Ms. Doe from exercising her legal right to gather evidence in communications with two key witnesses who were formerly her friends. However, even though at least one of those witnesses, Female Student, independently expressed fear of the Assailant, the Assailant was not prohibited from contacting witnesses.

n) Emory immediately granted the Assailant's requests for accommodations, while it denied identical requests from Ms. Doe;

o) All of the Assailant's witnesses were allowed to testify, but none of Ms. Doe's were able to do so.

426.     Therefore, there is more than adequate evidence to conclude that Emory enforced its policies and protocols selectively and to Ms. Doe's detriment based on its gender bias against women, especially those who have been raped.

***Relief Sought for Count IV***

427.     Due to Emory's selective, gender-biased enforcement of its policies in violation of Title IX, Ms. Doe has suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, and trauma; lost past and future earnings and earning capacity; and damage to reputation and earning potential.

428.     Ms. Doe therefore respectfully demands judgment against Defendant Emory awarding:

a) Damages in amounts to be established at trial, including, without limitation, reimbursement for all of Ms. Doe's tuition and related expenses; payment of Ms. Doe's expenses incurred as a consequence of the selective enforcement; damages for deprivation of equal access to the educational benefits and opportunities provided by Emory; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present, and future enjoyment of life, earnings, and earning capacity;

b) Injunctive relief to be determined at trial requiring Emory to comply with federal law under Title IX;

c) Pre- and post-judgment interest;

d) Costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

e) Such other relief as the Court may deem just and proper.

## COUNT V
### Breach of Contract

429.    Plaintiff Doe incorporates all preceding paragraphs by reference as though fully stated herein.

430.    Beginning in 2018, Ms. Doe was in a valid contractual relationship with Defendant Emory University. She was an Emory student who complied with the material terms of her contract with Emory, by, for example, paying tuition and fees; participating in Emory's education programs and activities; complying with Emory's codes of conduct; and completing coursework at Emory's Law School in pursuit of her J.D. degree.

431.    The University agreed to provide Ms. Doe with a legal education consistent with ABA accreditation requirements and to abide by the terms of various publications, including University catalogs, student manuals, student handbooks, websites, policy manuals, and other university policies and procedures, including those that referenced and incorporated the requirements of Title IX and the Clery Act.

432.    Georgia law recognizes implicit contractual obligations arising from such documents. See, e.g., Morehouse Coll., Inc. v. McGaha, 277 Ga. App. 529, 531, 627 S.E.2d 39, 41 (2005) (affirming jury's finding of liability based on failure to follow student handbook).

433.    Moreover, Emory's ABA accreditation requires that "[a]ll information that [the University] reports, publicizes, or distributes […] be complete, accurate and not misleading to a reasonable law school student or applicant."

434.    Emory materially breached its contract with Ms. Doe frequently and continually throughout her participation in its education programs and activities, for example by: 1) failing to provide consistent, accessible, or operable disciplinary policies; and 2) failing to comply with its policies when it responded to sexual misconduct complaints submitted by and against Ms. Doe, including those provisions incorporated from federal law.

435.    First, Emory's policies were confusing, incomplete, inconsistent, and

not adequately distributed to its population. For example, Emory SMPs:

     a.  Failed to explain how employee and student policies overlapped for students such as the Assailant who are also Emory employees;

     b.  Failed to include definitions for crucial terms such as "relevant" or "retaliatory effects";

     c.  Used a misleading definition of "retaliation" that did not require a causal link between adverse actions and the victim's involvement in a Title IX matter;

     d.  Failed to state that students could file discrimination complaints with the Department; and

     e.  Failed to describe hearing procedures on the pretense that it was all "up to the hearing board chair" and therefore not OTIX's responsibility.

436.    Second, Emory did not comply with its SMP when it responded to

Ms. Doe's sexual misconduct complaint against the Assailant and his

countercomplaints, including, but not limited to, by:

     a)  Discriminating against Ms. Doe based on her sex and gender;

     b)  Refusing to provide Ms. Doe a non-sexually-hostile environment, for example by not granting her requests for protective measures to prevent further contact with the Assailant and forcing her to come into contact with him by holding a hearing for his baseless retaliation complaint;

     c)  Refusing to treat Ms. Doe equitably or fairly during its sexual misconduct disciplinary proceedings;

     d)  Refusing to conduct thorough investigations;

e) Refusing to provide Ms. Doe actual or adequate notices of complaints, charges, and outcomes for and against her;

f) Refusing to allow Ms. Doe to gather and present crucial evidence and witness testimony;

g) Refusing to afford Ms. Doe access to important case information or an adequate opportunity to prepare her case;

h) Refusing to provide a hearing for her complaint against the Assailant;

i) Refusing to grant her requests for reasonable accommodations;

j) Retaliating against Ms. Doe for engaging in Title IX-protected activities; and

k) Failing to provide sufficient Title IX training for individuals authorized to implement the SMP.

437.    Defendant Emory University also breached the terms of its contract with Ms. Doe incorporated from federal law, including Title IX and the Clery Act.

438.    At all relevant times, Defendant Emory University expressly agreed to comply with the provisions of Title IX and the Clery Act within the terms of its contract with Ms. Doe, including, but not limited to, in statements that the University would comply with federal laws that appeared in publications such as its website, policy manuals, handbooks, and catalogs, not to mention in the Annual Security Reports (ASRs) that the Clery Act requires Emory to submit to the Department.

439.     Furthermore, Emory personnel, including Seidenberg and Buckner, explicitly promised Ms. Doe—and the Department—both verbally and in written communications that Emory would comply with the Clery Act and Title IX.

440.     Moreover, it is common knowledge that the subject of the contract—education—is a regulated industry.

441.      Emory's contracts with its students also provide that the University will remain qualified to receive federal funding from the Department and maintain its accreditation, including ABA accreditation for the Law School. However, Emory would no longer be eligible to receive federal funding or maintain its accreditation if it did not comply with Title IX and/or the Clery Act.

442.     As explained in Counts I, II, III, and IV, Emory breached the terms of its contract incorporated from Title IX by responding to Ms. Doe's sexual misconduct complaint with deliberate indifference (Count I, ¶¶ 382-393); retaliating against Ms. Doe for engaging in Title IX-protected activities (Count II, ¶¶ 394-407); reaching erroneous outcomes in disciplinary matters and requests for accommodations due to the University's gender bias against Ms. Doe (Count III, ¶¶ 408-418); and selectively implementing its policies and procedures disciplinary matters concerning Ms. Doe due to the University's gender bias against Ms. Doe (Count IV, ¶¶ 419-427).

443.    The terms of Emory's contract with Ms. Doe incorporated from the Clery Act applied to Ms. Doe complaints against the Assailant and his countercomplaints against her because the misconduct she reported constituted sexual assault and stalking in accordance with Clery Act definitions.

444.    From, at the latest, September 21, 2018, through, at the earliest, November 30, 2019, Emory frequently and continuously violated the Clery Act provisions of its contract with Ms. Doe, including, but not limited to, when authorized administrators such as Pannell, Seidenberg, Buckner, Poole, and Brokaw:

a) Failed to provide "prompt, fair, and impartial process[es] from the initial investigation to the final result" in the relevant complaints by and against Ms. Doe, 34 C.F.R. § 668.46 (k)(2)(i); 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa);

b) Failed to provide Ms. Doe a description of "each type of disciplinary proceeding used by the institution; the steps, anticipated timelines, and decision-making process for each type of disciplinary proceeding; how to file a disciplinary complaint; and how the institution determines which type of proceeding to use based on the circumstances of an allegation, the standard of evidence that would be used, or all of the possible sanctions that could result from disciplinary proceedings," when Emory learned of the Ms. Doe's and the Assailant's sexual misconduct complaints against one another, 34 C.F.R. § 668.46 (k)(1); 20 U.S.C. §1092(f)(1)(A), (8)(A)-(B);

c) Failed to provide Ms. Doe written notification of all of her rights, including her right to access all information that would be used in the sexual misconduct complaints submitted by and against her, 34 C.F.R. § 668.46(b)(11)(vii); 20 U.S.C. § 1092(f)(8)(C);

d) Failed to conduct disciplinary procedures "in a manner that [was] transparent to [Ms. Doe]," 34 C.F.R. § 668.46(k)(3)(i)(B)(1); 20 U.S.C. § 1092(f)(8)(B)(vi);

e) Allowed officials biased against Ms. Doe and without adequate training to conduct procedures related to complaints submitted by and against Ms. Doe, 34 C.F.R. § 668.46(k)(3)(i)(C), (k)(2)(ii); 20 U.S.C. § 1092(f)(8)(B)(iv)(I);

f) Failed to assist Ms. Doe with law enforcement, including by failing to inform the DeKalb County Police of the Assailant's location;

g) Failed to afford Ms. Doe timely access to information used in the disciplinary process that was equal to both the Assailant's access and Emory administrators' access, 34 C.F.R. § 668.46 (k)(3)(i)(B)(3); 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa);

h) Failed to keep Ms. Doe's requests for accommodations and protective measures confidential, 34 C.F.R. § 668.46(b)(11)(iii);

i) Refused to provide Ms. Doe the reasonable, appropriate, available accommodations and protective measures she requested, 34 C.F.R. § 668.46(b)(11)(v); 20 U.S.C. § 1092(f)(8)(B)(vi);

j) Failed to provide Ms. Doe written notice of all initial, interim, and final decisions by authorized administrators, including descriptions of decisions to move forward or dismiss among all complaints submitted by and against, any evidence reviewed, the standard of proof applied, and the rationale for the decisions, 34 C.F.R. § 668.46 (k)(2)(v), (k)(3)(iv); 20 U.S.C. §1092(f)(8)(B)(iv)(III); and

k) Retaliated against Ms. Doe. 34 C.F.R. § 668.46(m); 20 U.S.C. §1092(f)(17).

445. As a result of Emory's material breaches of contract, Ms. Doe suffered significant economic loss such as, *inter alia*, the costs and expenses incurred from loss of $23,000 of scholarship money for each of her last two years of law school, treatment for PTSD, attorney's fees for her first advisor, plane

tickets and fees for moving across the country, maintenance of an emotional support animal, lost earning potential, damage to reputation, loan interest, and many other costs, expenses, and losses.

*Relief Sought for Count V*

446.    Given that Defendant Emory University violated its contract with Ms. Doe by refusing to comply with the terms of its policies, including those terms incorporated from federal law, and given that Ms. Doe suffered economic damages as a direct result, Ms. Doe is entitled to damages for breach of contract.

447.    Ms. Doe therefore respectfully demands judgment against Defendant Emory University awarding:

a)  Damages in amount to be established at trial, including, without limitation, reimbursement for expenses Ms. Doe incurred as a consequence of Emory's breach of contract; lost access to education programs, activities, and benefits; lost career and business opportunities; loss of reputation; and lost past, present, and future earnings and earning capacity;

b)  Pre- and post-judgment interest;

c)  Costs and attorneys' fees; and

d)  Such other relief as the Court may deem just and proper.

**Count VI**
**Breach of the Covenant of Good Faith and Fair Dealing**

448.     Defendant Emory University breached the Covenant of Good Faith and Fair Dealing because it acted arbitrarily, maliciously, and in bad faith when it violated the terms of its contract with Ms. Doe.

449.     Emory repeatedly and continually breached its contract with Ms. Doe from, at the latest, September 21, 2018, through, at the earliest, November 30, 2019, by refusing to comply with its policies, including the provisions incorporated from federal law.

450.     Moreover, Emory breached its contract with Ms. Doe knowingly. The policies Emory violated were accessible to its officials in writing, Emory boasted that employees tasked with implementing SMPs received regular training in University policies and the applicable law, and not only Ms. Doe, but also CACD repeatedly reminded Emory what those provisions of Emory's SMP entailed, including those incorporated from federal law.

451.     Furthermore, Emory's employees frequently, deliberately, and contradictorily made false promises and lied about their actions, policies, and intentions, not only to Ms. Doe, but even to the federal government, for example when Buckner and Seidenberg claimed that they had already given Ms. Doe access to all of the documents she requested, that OTIX had notified the Hearing Board what allegations were under consideration for the hearing, that it had issued Ms. Doe written notice of all the complaints the Assailant or others

submitted against her, and that Female Student and Male Student A both

contacted OTIX without any prompting for the purpose of obtaining NCOs

against Ms. Doe.

452.    Most egregiously, Seidenberg, Buckner, and Pannell claimed that

Emory could unilaterally dismiss Ms. Doe's sexual misconduct complaints

against the Assailant, even though they had both verbally and in writing stated

that she was entitled to move forward with her complaint, including in a

conversation with the CACD Official.

453.    Finally, Emory's breaches were malicious because gender bias

against women motivated it to violate the provisions of its contract with Ms.

Doe.

***Relief Sought for Count V***

454.    Given that Defendant Emory University acted arbitrarily,

maliciously, and in bad faith when it materially breached its contract with Ms.

Doe causing her economic harm, Ms. Doe is entitled to damages for breach of the

Covenant of Good Faith and Faith Dealing.

455.    Ms. Doe therefore respectfully demands judgment against

Defendant Emory University awarding:

a) Damages in an amount to be established at trial, including, without
   limitation, reimbursement for expenses Ms. Doe incurred as a
   consequence of Emory's breach of the Covenant of Good Faith and Fair

Dealing; lost access to education programs, activities, and benefits; lost career and business opportunities; loss of reputation; delay beginning her career; and lost past, present, and future earnings and earning capacity;

b) Pre- and post-judgment interest;

c) Costs and attorneys' fees; and

d) Such other relief as the Court may deem just and proper.

## **VI. DEMAND FOR JURY TRIAL**

456.   Ms. Doe hereby demands a jury trial on all issues so triable.

Submitted respectfully this 1st day of April, 2022.

s/ Lisa Anderson
Lisa Anderson
Georgia Bar No. 179392
Atlanta Women for Equality
1168 Willivee Drive
Decatur, GA 30033
(404) 624-6822
lisa@atlantawomenforequality.org

***Attorney for Plaintiff Jane Doe***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

Pursuant to Local Rule 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in accordance with Local Rule 5.1 of the Northern District of Georgia using a font type of Book Antiqua and a point size of 13.

 /s/ Lisa Anderson
Lisa Anderson
Georgia Bar No. 179392
Atlanta Women for Equality
P.O. Box 33521
Decatur, GA 30033
(404) 624-6822
lisa@atlantawomenforequality.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2022, I electronically filed a copy of the

foregoing. Notice of this filing will be sent via email to all parties by operation of

the Court's electronic filing system. Parties may access this filing through the

Court's CM/ECF System.

Submitted respectfully this 1st day of April, 2022.

/s/ Lisa Anderson
Lisa Anderson
Counsel for Ms. Doe
Georgia Bar No. 179392
Atlanta Women for Equality
P.O. Box 33521
Decatur, GA 30033
(404) 624-6822
lisa@atlantawomenforequality.org