IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JANE DOE,

Plaintiff,

v.

EMORY UNIVERSITY, INC.,

Defendant.

CIVIL ACTION FILE
NO. 1:21-CV-4859-TWT

## OPINION AND ORDER

This is a Title IX action. It is before the Court on the Defendant Emory University, Inc.'s Motion to Dismiss [Doc. 21]. For the reasons set forth below, the Court GRANTS in part and DENIES in part the Defendant Emory University, Inc.'s Motion to Dismiss [Doc. 21].

## I.   Background

The Plaintiff, Jane Doe, was a law student at the Defendant, Emory University, Inc. (the "University"), for two semesters in fall 2018 and spring 2019. (Am. Compl. ¶ 1.) On August 18 and 19, 2018, the Plaintiff alleges that she was twice raped in her apartment by a male student, John Doe, who was enrolled in the University's Master of Laws program. (*Id.* ¶¶ 33-43.) Because sex is taboo in her Middle Eastern culture, the Plaintiff felt too ashamed to speak about or report the rape to anyone other than two childhood friends. (*Id.* ¶ 49.) By mid-September, though, she was experiencing post-traumatic stress disorder and found herself unable to sleep or concentrate on her coursework.

(*Id.* ¶ 51.) The fact that she shared a class with John Doe also made it impossible to avoid him. (*Id.* ¶ 50.) Fearing the consequences to her studies, the Plaintiff met on September 21, 2018, with Katherine Brokaw, the law school's Assistant Dean and Deputy Title IX Coordinator, to discuss her rape in hypothetical terms. (*Id.* ¶¶ 52-53.) According to the Plaintiff, Brokaw "intentionally gave false information" about the University's Title IX policies "for the purpose of discouraging her from going forward with a formal complaint." (*Id.* ¶¶ 54-58.) The Plaintiff declined to file a complaint against John Doe after speaking with Brokaw. (*Id.* ¶ 60.)

The Plaintiff's mental and physical condition continued to deteriorate over the ensuing months, limiting her ability to participate in classes, study groups, social gatherings, and other activities. (*Id.* ¶ 63-64.) On October 9, 2018, John Doe allegedly confronted the Plaintiff in class and admitted to raping her, and he was again enrolled in one of her classes in the spring semester. (*Id.* ¶¶ 61, 63.) Ultimately, the Plaintiff decided to report the sexual assault on March 4, 2019, to Judith Pannell, the Title IX Coordinator for Students with the University's Office of Title IX. (*Id.* ¶ 67.) She submitted a written statement for nonconsensual sexual contact and nonconsensual sexual intercourse, both violations of the University's Sexual Misconduct Policy (the "SMP"). (*Id.* ¶ 68.) The next day, Pannell notified John Doe of the Plaintiff's complaint and issued a No Contact Order ("NCO") against both individuals. (*Id.* ¶ 69.)

After reporting her rape to the appropriate officials, the Plaintiff asserts that the University "refused to grant most of her requests for reasonable accommodations and protective measures, sometimes providing falsehoods as explanations." (*Id.* ¶ 70.) For example, on March 4, 2019, the Plaintiff asked that she be allowed to attend class without John Doe due to her PTSD, but Pannell denied the request weeks later, citing American Bar Association rules and Title IX guidance published by the U.S. Department of Education's (the "Department") Office for Civil Rights ("OCR"). (*Id.* ¶¶ 71-72.) That same month, the Plaintiff also asked to postpone her final exams and take them near family in her home state. (*Id.* ¶ 106.) The University "responded to [the Plaintiff's] requests so slowly and belligerently that [her] attempts to secure reasonable exam accommodations became one of her most stressful and time-consuming activities for the next two months." (*Id.* ¶ 110.) Only after the Plaintiff involved the Department's Clery Act Compliance Division ("CACD") did the University agree to the Plaintiff's exam request on May 20, 2019. (Am. Compl. ¶¶ 111-152.)

Over its 127 pages and 456 paragraphs, the Amended Complaint describes in detail the University's process for investigating and adjudicating the Plaintiff's complaint against John Doe. It also describes the multiple complaints which John Doe later filed against the Plaintiff with the Office of Title IX. For purposes of the Motion to Dismiss, the Court need not recount these events in the same exacting detail as the Amended Complaint. Some

3

specifics, though, are needed to resolve the University's arguments for dismissal.

On March 20, 2019, after learning that she would have to remain in class with John Doe, the Plaintiff told her father about the sexual assault. (*Id.* ¶¶ 75-78.) That night, the father called and asked John Doe to transfer out of his daughter's First Amendment class—against her express instructions. (*Id.* ¶¶ 79-80.) In response, John Doe filed a police report and informed his advisor about the call, who emailed Pannell that John Doe wished to file a retaliation complaint against the Plaintiff. (*Id.* ¶ 82.) The Plaintiff's parents also contacted the police to report John Doe for sexual assault. (*Id.* ¶ 84.) On March 23 or 24, 2019, with detectives searching for him, John Doe flew back to his home country and, upon information and belief, has never returned to the United States. (*Id.* ¶¶ 91-92.) The Plaintiff did not learn about John Doe's retaliation complaint until a week later from Kristyne Seidenberg, the Interim Title IX Coordinator for Students. (*Id.* ¶ 97.) John Doe went on to file at least two more complaints against the Plaintiff: one on April 8, 2019, for instigating a female student to ask John Doe's friends about his whereabouts, and another on April 22, 2019, for instigating the same female student to message John Doe about the University's investigation. (*Id.* ¶¶ 156-59, 169.) The University failed to provide the Plaintiff with prompt notice of these two complaints and the grounds for them. (*Id.* ¶¶ 160, 170, 186.)

4

Throughout the disciplinary proceedings, the Plaintiff complains, the University "treated her as inferior to her rapist and with open hostility[.]" (*Id.* ¶ 153.) This treatment, she continues, made clear that "the University's officials held her in contempt because she was a female rape survivor with a deeply religious, culturally conservative background who, despite suffering severe PTSD, did not want to give up on her education." (*Id.*) Both the Plaintiff's and John Doe's complaints were investigated on the same timeline by the Office of Title IX. (*Id.* ¶¶ 102, 174-75.) The Plaintiff alleges that Seidenberg and other University investigators subjected her to aggressive, hostile questioning about her rapist's accusations and often with short deadlines. (*Id.* ¶¶ 103-06, 162-68, 182-83.) At various times, University officials withheld accommodations from the Plaintiff until she agreed to be interviewed, blamed the Plaintiff for not participating in enough interviews with investigators, and threatened to submit their findings without the Plaintiff's input. (*Id.* ¶¶ 103-04, 161, 166-68, 171-72.)

On August 14, 2019, Seidenberg emailed the Plaintiff two investigation reports: one for her complaint and another for John Doe's complaints. (*Id.* ¶ 192.) Both reports, the Plaintiff alleges, "were severely and unabashedly biased against [her]." (*Id.*) They "viciously claimed that [the Plaintiff] was of 'questionable' credibility because she was 'hesitant to give detailed answers' to questions demanding graphic details about taboo acts that resulted in the most traumatic experiences of her life." (*Id.* ¶ 197.) The reports also "attacked [the

5

Plaintiff] for exercising legally protected rights," such as declining to answer questions about John Doe's complaints for which she had not received proper notice. (*Id.* ¶ 199.) They also criticized the Plaintiff for answering some questions in writing, even though she was offered that option, and excluded documentary evidence and witness testimony that was central to the Plaintiff's case. (*Id.* ¶¶ 200, 217-22.) On the other hand, the reports allegedly ignored parts of John Doe's testimony that were either inconsistent or directly contradicted by the evidence. (*Id.* ¶¶ 203-11.) The Plaintiff also learned that the University had stretched its policies to allow John Doe to finish the semester remotely and had presented information about the Plaintiff's father to the University's Threat Assessment Team. (*Id.* ¶¶ 213, 215.) By contrast, the University conducted no threat assessment on John Doe following the Plaintiff's sexual assault complaint. (*Id.* ¶ 216.)

The Plaintiff did not re-enroll at the University in the fall. (*Id.* ¶ 227.) Still, soon after publishing the reports, the University issued NCOs against the Plaintiff for two other students who had allegedly filed Title IX complaints against her. (*Id.* ¶¶ 227-28.) The University never showed the Plaintiff an actual complaint from either student, both of whom were important witnesses in her case. (*Id.* ¶ 229.) Then, on August 23, 2019, the Plaintiff withdrew her sexual assault complaint against John Doe, relying on an earlier promise from Seidenberg that she could reopen the case at any time. (*Id.* ¶ 230.) She wrote:

> [The University's] Title IX office has shown itself to be
> inequitable, unfair, deceiving, and truly harmful to victims. The
> worst decision of my life was accepting [John Doe's] invitation to
> join him and a friend at a bar. The second worst decision was
> informing [the University] about what he did to me. I do not trust
> [the University] with my case, and because of that, I am formally
> withdrawing it from your office.

(*Id.*) On August 28, 2019, Seidenberg notified the Plaintiff that the University
was pursuing charges against her for retaliating against John Doe in violation
of the SMP. (*Id.* ¶ 239.) The Plaintiff responded that she would contest the
charges and undergo a hearing. (*Id.* ¶ 240.) On October 10, 2019, the Plaintiff
also emailed Seidenberg to reopen her complaint against John Doe; Seidenberg
confirmed that the Plaintiff's notice was adequate and that the Office of Title
IX would promptly move forward with the request. (*Id.* ¶¶ 246-49.)

In the weeks leading up to her hearing, the Plaintiff sought clarification
from Seidenberg and the University's new Title IX Coordinator, Yolanda
Buckner, about the hearing procedures. (*Id.* ¶ 245.) Their responses "were not
only incomplete, but often false and in direct conflict with the SMP and federal
law." (*Id.*) The University never provided the Plaintiff with written notice of
John Doe's post-March 20, 2019 complaints, despite her repeated requests. (*Id.*
¶¶ 262-64, 307.) And the Plaintiff's record requests to the University were met
with "various inconsistent, incorrect assertions and brazenly illegal actions."
(*Id.* ¶ 251, 295-96.) For example, Buckner and Seidenberg described the
Plaintiff's record requests as overly broad, offering to provide her only with
documents that she could specifically identify. (*Id.* ¶ 253, 326, 359-60.) But

even when the Plaintiff followed this instruction, she received conflicting responses: on some occasions, University officials would promise to produce the documents, whereas on other occasions, they would disclaim any obligation to provide records other than those originally included with the investigation reports. (*Id.* ¶¶ 255-60, 298, 328-35, 354.) "To this day, [the University] still has not produced the vast majority of the records [the Plaintiff] has been legally entitled to access." (*Id.* ¶ 261.)

The Plaintiff also takes issue with several aspects of the hearing itself, which began on October 22, 2019. (*Id.* ¶ 279.) The Office of Title IX claimed to delegate significant authority to the hearing board and its chairman, even allowing him to impose procedural requirements that deviated from the SMP. (*Id.* ¶¶ 275, 277-78.) Consequently, the Plaintiff had trouble preparing her case. (*Id.*) To start, the chairman refused to tell the Plaintiff whether the hearing involved any events after the March 20, 2019 phone call between John Doe and the Plaintiff's father. (*Id.* ¶ 285.) The Plaintiff also was not invited to submit a written statement to the board before the hearing, unlike John Doe, and never received John Doe's written statement. (*Id.* ¶ 286.) Further, even though the SMP permitted parties to call any witnesses with "relevant" testimony, the chairman imposed a "direct knowledge" standard which he used to exclude all of the Plaintiff's witnesses. (*Id.* ¶¶ 271-72.) During the hearing, John Doe frequently interrupted, insulted, and threatened the Plaintiff and others on the Zoom call. (*Id.* ¶¶ 279-81.) Although the chairman warned John

8

Doe to control himself, his intimidating behavior allegedly persisted with impunity. (*Id.* ¶ 282.)

After the hearing's first day, a CACD official emailed Seidenberg, Buckner, and the Plaintiff to express concern that "there seems to be some confusion about the charges to be adjudicated[.]" (*Id.* ¶ 294.) Eventually, Seidenberg agreed to assert a single charge against the Plaintiff based on the March 20, 2019 phone call and its potential retaliatory effects. (*Id.* ¶ 302.) When the hearing resumed on November 1, 2019, Seidenberg read this clarification aloud to the board and the parties, prompting immediate "shock" and an off-the-record discussion among the board. (*Id.* ¶¶ 336-38.) A new issue also arose on the hearing's second day: the chairman refused to allow the "vast majority" of questions that the Plaintiff had prepared for John Doe and the other witnesses. (*Id.* ¶ 340.) Some of those questions concerned the basic elements of a retaliation charge as well as the credibility of the witnesses, but the chairman determined that they were "not relevant as to whether or not retaliation occurred[.]" (*Id.* ¶¶ 340-44.) Once the witnesses had all testified, the chairman asked the parties to submit closing statements in writing to avoid prolonging the hearing. (*Id.* ¶ 351.)

Abruptly, on November 5, 2019, Seidenberg emailed the Plaintiff that John Doe "had 'withdrawn his complaint,' which was 'now closed.'" (*Id.* ¶ 356.) Still, the CACD official continued to point out "deeply concerning" aspects of the University's disciplinary process, including the timing and adequacy of

9

notices, the mechanics of the hearing process, and the production of requested records. (*Id.* ¶ 358.) The next day, Buckner responded that the CACD official's email was "disappointing" and that the Plaintiff's complaint against John Doe was now "closed, per [the Plaintiff's] request." (*Id.* ¶¶ 359, 362.) The Plaintiff immediately demanded the rationale for closing her complaint given that she had reopened it one month earlier. (*Id.* ¶¶ 363-64.) The parties continued to exchange emails about this matter until November 19, 2019, when the CACD official recommended a phone call to address the status of the Plaintiff's complaint and record requests. (*Id.* ¶¶ 365-70.) That phone call never took place. (*Id.* ¶ 372.)

In February 2021, the Plaintiff and two other women submitted a formal complaint to the Department, citing gender animus, inequitable treatment, and retaliation for reporting sexual assault to the University. (*Id.* ¶ 376.) The Plaintiff then initiated this action on November 28, 2021. Both the original Complaint and the Amended Complaint raise six claims against the University: four under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, one for breach of contract, and one for breach of the covenant of good faith and fair dealing. (*Id.* ¶¶ 383-455.) The University moved to dismiss the Amended Complaint in full, and that Motion is now fully briefed and ripe for review.

## II.   Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that the plaintiff "receives the benefit of imagination" at the pleading stage). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of his claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

## III.   Discussion

The University moves to dismiss the Amended Complaint on four grounds. The first is that the Plaintiff's Title IX claims are time-barred under the applicable two-year statute of limitations. The second is that the Title IX

11

claims, if timely, fail to plead facts showing that the Plaintiff was subjected to discrimination because of her gender or suffered a material adverse action by the University. Third, the University argues that the Amended Complaint does not identify a specific contract between the parties that could support claims for breach of contract and for breach of the covenant of good faith and fair dealing. Finally, the University argues that the Amended Complaint's considerable length renders it an impermissible shotgun pleading.

## A.  Statute of Limitations for Title IX Claims

Because Congress did not include a statute of limitations in Title IX, "the most closely analogous statute of limitations under state law governs the federal cause of action." *M.H.D. v. Westminster Schools*, 172 F.3d 797, 803 (11th Cir. 1999). In Georgia, the Eleventh Circuit has held, the closest comparison is the two-year limitations period for personal injury actions. *See id.* According to the Plaintiff, though, Georgia's six-year statute of limitations for breach of contract actions should control. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 3-4.) This argument relies on *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022). There, the Supreme Court applied a "contract-law analogy" to determine what remedies are available to private litigants under statutes—like Title IX—that were enacted under the Spending Clause of the Constitution. *Cummings*, 142 S. Ct. at 1570 (citation omitted). At no point in this inquiry did the Court suggest that the contract-law analogy also governs the statute of limitations in Spending Clause cases, and since

*Cummings*, courts continue to use the limitations period for personal injury claims. *See, e.g.*, *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022) ("Title IX thus borrows from Ohio's two-year statute of limitations for personal injury claims."). Applying the Eleventh Circuit's *M.H.D.* decision, as this Court must do, the Plaintiff's Title IX claims are subject to a two-year statute of limitations.

Next, the parties dispute the date on which the Plaintiff's claims accrued. Whereas state law sets the duration of the limitations period, federal law governs when that period begins to run. *See Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1275 (11th Cir. 2014). The general federal rule—known as the "discovery rule"—provides that a cause of action accrues "when the plaintiff knew or should have known of his injury and its cause." *White v. Mercury Marine, Div. of Brunswick, Inc.*, 129 F.3d 1428, 1435 (11th Cir. 1997). All circuit courts of appeals to reach the issue have applied the discovery rule to Title IX claims, *see Snyder-Hill*, 48 F.4th at 699 (collecting cases), and this Court will do the same.

The University argues that the Plaintiff's Title IX claims ripened at the latest on November 5, 2019, when John Doe withdrew (and the University closed) his Title IX complaints against the Plaintiff. (Def.'s Br. in Supp. of Def.'s Mot. to Dismiss, at 3.) If correct, this date would put the Plaintiff's claims, which were filed on November 28, 2021, just outside the statute of limitations. In response, the Plaintiff invokes the continuing violations doctrine, arguing

13

that her claims are timely because the University's "discriminatory acts against [her] are ongoing to this day." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 1-2.) "Under that doctrine, a plaintiff can sue for actions that occurred outside the applicable limitations period if a defendant's conduct is part of a continuing practice and the last act evidencing the continuing practice falls within the limitations period." *Mathews v. Clark Atlanta Univ., Inc.*, 2021 WL 4896330, at *5 (N.D. Ga. Feb. 23, 2021) (citing *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)). To show a continuing violation, a plaintiff must do more than "complain of the present consequence of a one time violation"; there must be a "continuation of that violation into the present[.]" *Knight v. Columbus, Ga.*, 19 F.3d 579, 581 (11th Cir. 1994) (quotation marks and citation omitted).

The Plaintiff points to three events which she argues bring her Title IX claims within the statutory time frame. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 2-3.) The first is that the University has yet to issue an appellate ruling on the Plaintiff's sexual assault complaint against John Doe. (*Id.* at 2.) However, as the Court reads the Amended Complaint and the parties' briefs, the Plaintiff has not plausibly alleged that any appellate review is now—or ever was—underway in her case. Indeed, Buckner repeatedly informed the Plaintiff in early November 2019 that the University considered her complaint withdrawn. (Am. Compl. ¶¶ 359, 362, 365, 368.) Although the Plaintiff objected on the grounds that she had reopened her case in October 2019, Buckner did

14

not budge from her position, and the last alleged communication between the parties on this matter came on November 12, 2019. (*Id.* ¶¶ 246-249, 363-64, 366, 369.) In a November 6, 2019 email, the Plaintiff also asked Buckner to explain the rationale for closing her complaint so that she could appeal the decision. However, there is no allegation that Buckner ever provided the requested explanation or that the Plaintiff ever initiated a formal appeal. Under these circumstances, the Court finds, the University's failure to adjudicate a nonexistent appeal cannot form the basis for a continuing violation.

Next, the Plaintiff cites an agreement between the University and OCR dated December 18, 2019 (the "OCR Agreement"), in which the Plaintiff claims that the University committed to remedy the "discriminatory procedures" in her case. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 2-3.) According to the Plaintiff, the University's "response to the rape and retaliation [the Plaintiff] endured continued through that day, weeks less than two years before she filed her complaint." (*Id.* at 3.) Again, this argument is belied by the Amended Complaint and the documents referenced in it. The OCR Agreement was the product of a compliance review, initiated by OCR on December 6, 2013, into the University's handling of sexual harassment complaints. (Am. Compl. ¶ 22; Reply Br. in Supp. of Def.'s Mot. to Dismiss, Ex. A at 1.) The compliance review focused on complaints made from 2013 to 2015—that is, more than three years before the Plaintiff filed her complaint on March 4, 2019. (Reply Br. in Supp.

15

of Def.'s Mot. to Dismiss, Ex. A at 2, 8.) To resolve the compliance review, the University agreed to, among other things, examine all sexual harassment cases handled from August 1, 2018, through May 31, 2019, and to report the problems, if any, in providing a prompt and equitable response in each case. (Reply Br. in Supp. of Def.'s Mot. to Dismiss, Ex. A at 11 & Ex. B at 2-3.) By December 5, 2019, the University was required to provide its recommendations for addressing the problems identified to OCR. (*Id.*, Ex. B at 3.)

Contrary to the Plaintiff's allegations, neither the compliance review nor the OCR Agreement was an "internal appellate review" specific to her case. (Am. Compl. ¶¶ 373-74, 392, 416.) And although the Plaintiff claims that the University is now "sitting" on her case, the entire review and recommendation process was finished by December 5, 2019. (*Id.* ¶ 392.) The fact that the Plaintiff received no notice of the University's conclusions is not surprising: the OCR Agreement was executed between the University and OCR, not the Plaintiff, and it contained no reporting requirements as to the individuals whose Title IX complaints were under review. (Reply Br. in Supp. of Def.'s Mot. to Dismiss, Ex. B at 3.) Further, if the University found no problems in its response to the Plaintiff's case, then there would be nothing to report and no changes in the case's outcome. The fact remains that the Plaintiff had notice on November 6, 2019, that the University had closed her complaint against John Doe. (Am. Compl. ¶ 359, 362.) Other than protesting this decision by email, there is no allegation that the Plaintiff reopened or refiled her complaint

16

or initiated an appeal with the University after that date.

Placed in their proper context, the compliance review and the OCR Agreement give the Court no basis to extend the statute of limitations. The Amended Complaint references the OCR Agreement in two of four Title IX claims: Count I for deliberate indifference and Count III for erroneous outcomes in disciplinary proceedings due to gender bias. (*Id.* ¶¶ 392, 416.) To be liable for deliberate indifference, a defendant's conduct "must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (quotation marks, citations, and alteration omitted). This standard contemplates "circumstances wherein the [defendant] exercises substantial control over both the harasser and the context in which the known harassment occurs"; "[o]nly then can the [defendant] be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the [defendant's] programs." *Id.* Here, the Plaintiff does not allege that the University's internal review of her case caused her to undergo or be vulnerable to any harassment during the limitations period. After all, by December 19, 2019—the date cited as a continuing violation by the Plaintiff[1]—neither the Plaintiff nor John Doe were

---

[1] The Plaintiff's reference to December 19, 2019, in her response brief appears to be a typographical error, as she immediately cites a document dated December 18, 2019. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 2.) Regardless, this one-day discrepancy has no effect on the Court's analysis.

present at the University, and John Doe had withdrawn his complaints against her. (Am. Compl. ¶¶ 91-92, 227.) *See Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) (declining to apply the continuing violation doctrine to a deliberate indifference claim where the plaintiff was not a student at the defendant-university within the limitations period). Meanwhile, to succeed on an erroneous outcome claim, "a student must show both [1] that he was innocent and wrongly found to have committed an offense and [2] that there is a causal connection between the flawed outcome and sex bias." *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022).[2] As to the first element, the University made and communicated its investigative findings and conducted the Plaintiff's disciplinary hearing outside the statute of limitations. (Am. Compl. ¶¶ 359, 362.) Since the compliance review and the OCR Agreement were not a continuation of the University's adjudicative process, they are not a continuation of any alleged erroneous outcomes. In sum, the Court

---

[2] In *Samford University*, the Eleventh Circuit departed from the erroneous outcome test and adopted a more comprehensive test (originally developed by the Seventh Circuit) to establish liability for a university's disciplinary proceeding. Under the Seventh Circuit test, the relevant question is "whether the alleged facts, if true, permit a reasonable inference that the university discriminated against [the student] on the basis of sex." *Samford Univ.*, 29 F.4th at 687. The erroneous outcome test and the Seventh Circuit test are not inconsistent with each other; rather, the erroneous outcome test is a "fact-specific application[] of the Seventh Circuit test[.]" *Id.* at 692. That is, it "simply describe[s] [one] way[] in which a plaintiff might show that sex was a motivating factor in a university's decision." *Id.* at 687 (citation omitted). For clarity, because the Plaintiff pled Count III as an erroneous outcome claim, the Court repeats the erroneous outcome test in this context.

determines that the compliance review and the OCR Agreement do not make the Plaintiff's Title IX claims timely.

Finally, the Plaintiff highlights that CACD has been "continuously . . . involved" in the disciplinary proceedings in her case. (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 3.) In February 2021, the Plaintiff and two other women also submitted a formal complaint to the Department, alleging that they suffered gender animus, inequitable treatment, and retaliation after reporting sexual violence to the University. (Am. Compl. ¶ 376.) According to the Plaintiff, because the University will not recognize "her rights under the Clery Act," it was "impossible to avoid the current phase of the resolution process, which is still in progress." (Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss, at 3.) But these allegations do not implicate any action—wrongful or otherwise—by the University within the limitations period. Rather, in asking the Department to intervene in her case, the Plaintiff is seeking to remedy statutory violations that she alleges occurred in the past—during the University's investigation, adjudication, and termination of her and John Doe's complaints. The continuing violation doctrine does not apply in such circumstances. [3] *See*

---

[3] Further, as explained below, the Clery Act expressly does not contain a private cause of action against educational institutions, and courts prohibit private litigants from attempting to enforce the Clery Act through other causes of action—for example, breach of contract, negligence *per se*, and fraud. *See, e.g.*, *Mathews*, 2021 WL 4896330, at *10; *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 703-04 (M.D. Tenn. 2018); *Karasek v. Regents of the Univ. of Cal.*, 2015 WL 8527338, at *22 n.17 (N.D. Cal. Dec. 11, 2015). Accordingly, the Court is skeptical that the Plaintiff could use either the University's ongoing

*Hamilton*, 453 F.3d at 1335 ("[T]his Circuit distinguishes between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of that violation into the present, which does." (citation omitted)). Accordingly, the Court finds that the Plaintiff has not identified any action by the University which would warrant application of the continuing violation doctrine to her Title IX claims.

Again, under federal law, "[t]he touchstone for determining the commencement of the limitations period is notice: a cause of action generally accrues when a plaintiff knows or has reason to know of the injury that is the basis of his action." *Stanley*, 433 F.3d at 1136 (quotation marks and citation omitted). "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Id.* (citation omitted). As alleged, the Plaintiff had notice of all actions and events underlying her Title IX claims by November 6, 2019. (Am. Compl. ¶¶ 390-91, 400, 413, 415, 422, 425.) At that point, the University had issued its investigation reports on the Plaintiff's and John Doe's complaints; the hearing on John Doe's retaliation complaint had concluded; and the University had communicated to the Plaintiff that John Doe's complaints were withdrawn and the Plaintiff's complaint was closed. (*Id.* ¶¶ 239, 351, 356, 362.) These events

noncompliance with the Clery Act or her efforts to bring the University into compliance as a means to extend the statute of limitations on her Title IX claims.

20

"should have alerted a reasonable person to act to assert his or her rights at the time of the violation," and consequently, the Plaintiff cannot now invoke the continuing violation doctrine. *Hamilton*, 453 F.3d at 1335 ("[W]e have limited the application of the continuing violation doctrine to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred."). Because the Plaintiff did not initiate this action until November 28, 2021, her Title IX claims are time-barred under the two-year statute of limitations and must be dismissed.

## B. Contract Claims

### 1. Breach of Contract (Count V)

In Georgia, there are three essential elements to state a claim for breach of contract: (1) a valid contract, (2) a material breach of the contract's terms, and (3) damages resulting from the breach. *See Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015). The Plaintiff alleges that she entered into a contractual relationship with the University when she became a student in good standing there. (Am. Compl. ¶ 430.) Under this contractual relationship, she alleges, the University agreed to "abide by the terms of various publications, including University catalogs, student manuals, student handbooks, websites, policy manuals, and other [U]niversity policies and procedures, including those that referenced and incorporated the requirements of Title IX and the Clery Act." (*Id.* ¶ 431.) In the Motion to Dismiss, the University argues that no such agreement arose between the

parties. (Def.'s Br. in Supp. of Def.'s Mot. to Dismiss, at 20-22.) According to the University, "the Amended Complaint does not properly allege contract formation; it is devoid of any facts establishing the parties' mutual assent to the terms of the 'various publications' upon which [the] Plaintiff purports to rely." (*Id.* at 21.)

To start, courts regard a student's relationship to her university as one based in contract. *See Pinder v. John Marshall L. Sch., LLC*, 11 F. Supp. 3d 1208, 1221 (N.D. Ga. 2014) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)). The terms of that contract are usually derived from the university's student handbook and other policies and procedures. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007); *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005); *Mathews*, 2021 WL 4896330, at *10. Courts "interpret such contractual terms in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." *Havlik*, 509 F.3d at 34; *see also Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011). So, for example, if a university's policies guarantee certain hearing procedures in a disciplinary proceeding, then a student may sue in contract if she is denied access to those procedures. *See, e.g., Anderson*, 450 F. App'x at 502 ("Accordingly, a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings.").

That was the case in *Morehouse College, Inc. v. McGaha*, 277 Ga. App. 529 (2005). There, the Morehouse College student handbook promised an informal hearing and, if necessary, a formal hearing to students facing misconduct charges; the handbook also required that all hearings be "fundamentally fair" and that students be presumed innocent until proven guilty. *See Morehouse Coll.*, 277 Ga. App. at 530. When McGaha, a Morehouse student, was accused of committing tuition fraud, he was not given an informal hearing, and his formal hearing was riddled with procedural errors that prejudiced his defense. *See id.* at 530-31. After the hearing board expelled McGaha, he filed a breach of contract suit and won a jury verdict against Morehouse. On appeal of the damages award, the Georgia Court of Appeals affirmed that "Georgia law permits an expelled student to bring a breach of contract action against a private educational institution." *Id.* at 531. In McGaha's case, the court noted, "the breach of contract was Morehouse's failure to abide by the hearing procedures in its student handbook, which resulted in McGaha's expulsion." *Id.* at 532.

*Doe v. Rollins College*, 352 F. Supp. 3d 1205 (M.D. Fla. 2019), followed a similar pattern. The plaintiff in *Doe* sued Rollins College after he was expelled for violating the university's Title IX Sexual Misconduct Policy. *See Rollins Coll.*, 352 F. Supp. 3d at 1207. In addition to his Title IX claims, the plaintiff alleged that "his enrollment at Rollins, payment of tuition and fees, and attendance" created a contractual relationship, the terms of which "were

23

set forth in the student handbook and Rollins' policies and procedures[.]" *Id.* at 1212. The plaintiff alleged that Rollins, in adjudicating the complaint against him, violated its policy to reach "an outcome based on information that is credible, relevant, based in fact, and without prejudice, without regard to any irrelevant prior sexual history." *See id.* (quotation marks and citation omitted). On a motion to dismiss, the court held that "[t]hese allegations give rise to a plausible breach of contract claim. Plaintiff has identified specific provisions of the Sexual Misconduct Policy that Rollins purportedly breached and facts alleging how the breach occurred." *Id.* (citation omitted).

Here, the Plaintiff's allegations closely resemble those upheld in *McGaha* and *Rollins College*. According to the Amended Complaint, beginning in 2018, the Plaintiff formed a contract with the University by "paying tuition and fees; participating in [the University's] education programs and activities; complying with [the University's] codes of conduct; and completing coursework at [the University's] Law School in pursuit of her J.D. degree." (Am. Compl. ¶ 430.) She points to specific policies and procedures—from the SMP, Title IX, and the Clery Act—that were incorporated into that contract and breached by the University in handling her and John Doe's complaints. (*Id.* ¶¶ 431, 435-37, 442, 444.) For example, the Plaintiff asserts that the University committed at least 11 violations of the SMP, including refusing to grant her requests for reasonable accommodations and failing to provide adequate notice of the complaints and charges against her. (*Id.* ¶ 436.) These allegations are sufficient

to survive a motion to dismiss.

However, the University is correct that its alleged Clery Act violations are not actionable in a breach of contract claim. (Def.'s Br. in Supp. of Def.'s Mot. to Dismiss, at 20 n.8; Reply Br. in Supp. of Def.'s Mot. to Dismiss, at 15.) As set forth in 20 U.S.C. § 1092(f)(14)(A), the Clery Act does not "(i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or (ii) establish any standard of care." Courts, including the Eleventh Circuit, have recognized that there is no private cause of action under the Clery Act. *See Emery v. Talladega Coll.*, 688 F. App'x 727, 729-30 & n.1 (11th Cir. 2017) (collecting cases). Nor can a private litigant enforce the Clery Act through a negligence claim since the statute does not give rise to a standard of care. *See id.* at 730. At least one court in this district has extended § 1092(f)(14)(A) to breach of contract claims. In *Mathews*, the court held that a plaintiff "cannot circumvent the lack of a Clery Act private right of action by recharacterizing the cause of action as a state law breach of contract claim." *Mathews*, 2021 WL 4896330, at *10. Although the Clery Act does not speak to private contracting rights, it does forbid parties from introducing "evidence regarding compliance or noncompliance with this subsection . . . in *any proceeding* of *any court*, agency, board, or other entity, except with respect to an action to enforce this subsection."[4] 20 U.S.C. § 1092(f)(14)(B) (emphasis

---

[4] The Department has sole authority to enforce the Clery Act. *See*

added). Without such evidence, it is impossible for the Plaintiff prove that the University breached any obligations incorporated from the Clery Act into the parties' contract.

### 2.  Breach of Covenant of Good Faith and Fair Dealing (Count VI)

The Plaintiff's final claim is for breach of the covenant of good faith and fair dealing, which alleges that the University "acted arbitrarily, maliciously, and in bad faith when it violated the terms of its contract with [the Plaintiff]." (Am. Compl. ¶ 448.) As explained in *Stuart Enterprises International, Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 233-34 (2001), there is a duty to perform a contract in good faith under both statutory and common law, but this duty does not create a cause of action independent from breach of contract. That is, there must be a breach of contract to maintain a claim for breach of the covenant of good faith and fair dealing. *See id.*; *see also Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990) ("[T]he 'covenant' is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*." (citations omitted)). "Because [the] Plaintiff's breach of contract claim is ripe for immediate dismissal," the University argues, "so, too, is her breach of the covenant of good faith and fair dealing claim." (Def.'s Br. in Supp. of Def.'s Mot. to Dismiss, at 24.) Given that

---

*Emery*, 688 F. App'x at 730 n.1.

the Court has not dismissed the Plaintiff's breach of contract claim, this argument fails.

## C. Shotgun Pleading

Finally, the University argues that the Amended Complaint should be dismissed as a shotgun pleading based on its sheer length alone. (Def.'s Br. in Supp. of Def.'s Mot. to Dismiss, at 24-25.) The defining feature of a shotgun pleading is its lack of clarity, not its length. In other words, a shotgun complaint is one that fails "to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading[.]" *Beckwith v. Bellsouth Telecomms., Inc.*, 146 F. App'x 368, 371 (11th Cir. 2005). The University does not argue that the Amended Complaint falls under a single one of the four categories of shotgun pleadings recognized in the Eleventh Circuit. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). Even if the University had made such an argument, it would ring hollow: based on the Motion to Dismiss, the University understood each of the Plaintiff's claims and the allegations supporting them well enough to make coherent arguments for dismissal. *Abrams v. CIBA Specialty Chemicals Corp.*, 2008 WL 4183344, at *5 (S.D. Ala. Sept. 10, 2008) ("Indeed, defendants' own filings in support of their Rule 12(b) Motion reveal that they understand, at least in general terms, the nature of the claims against them. This is simply not a case in which a defendant is unable to respond to an unintelligible pleading; to the contrary, defendants clearly grasp the claims against them

27

well enough to file an answer."). Thus, the Court declines to dismiss the Plaintiff's remaining claims on shotgun pleading grounds.

### IV.    Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Defendant Emory University, Inc.'s Motion to Dismiss [Doc. 21]. Counts I through IV in the Amended Complaint are dismissed with prejudice.

SO ORDERED, this  5th  day of December, 2022.

THOMAS W. THRASH, JR.
United States District Judge